NITRO LEISURE PRODUCTS, L.L.C. (doing business as Golfballsdirect.com and as Second Chance), Plaintiff–Appellee,

v.

ACUSHNET COMPANY, Defendant–Appellant.

No. 02–1572.

United States Court of Appeals, Federal Circuit.

Aug. 26, 2003.

Mark W. Yocca, Yocca Patch & Yocca LLP, of Irvine, California, argued for plaintiff-appellee. With him on the brief were Ryan M. Patch and Paul Kim. Of counsel on the brief was Mark G. Davis, McDermott, Will and Emery, of Washington, DC.

James F. Davis, Howrey Simon Arnold & White, of Washington, DC, argued for defendant-appellant. With him on the brief were Joseph P. Lavelle and Celine T. Callahan.

Before PAULINE NEWMAN, BRYSON and LINN, Circuit Judges.

Opinion for the Court by Circuit Judge LINN. Dissenting opinion by Circuit Judge PAULINE NEWMAN.

LINN, Circuit Judge.

Acushnet Company ("Acushnet") appeals from the denial of its motion for a preliminary injunction by the United States District Court for the Southern District of Florida. *In re Nitro Leisure Prods., L.L.C.*, No. 02–14008–CV–Middlebrooks (S.D.Fla. Aug. 9, 2002) (*"Order"*). Because the district court did not abuse its discretion in denying Acushnet's motion in view of Acushnet's failure to show a reasonable likelihood of success on the merits of its claims, we affirm.

## BACKGROUND

Acushnet manufactures and sells golfing equipment, and in particular, golf balls. Acushnet owns and has federally registered the trademarks TITLEIST, ACUSHNET, PINNACLE, and PRO V1. Of particular interest in this case, Acushnet manufactures and markets new golf balls under the TITLEIST name and trademark, including the TITLEIST PRO V1, asserted by Acushnet to be the best selling golf ball in the United States since February 2001. *Order* at 2–3.

Nitro obtains and sells two categories of used golf balls at a discounted rate. The first category of balls are "recycled" balls. The recycled balls are those found in relatively good condition, needing little more than washing, and are repackaged for resale. Recycled balls represent approximately 30% of Nitro's sales. The second category includes balls that are found with stains, scuffs or blemishes, requiring "refurbishing." Nitro's refurbishing process includes cosmetically treating the balls by removing the base coat of paint, the clear coat layer, and the trademark and model markings without damaging the covers of the balls, and then repainting the balls, adding a clear coat, and reaffixing the original manufacturer's trademark. Nitro also applies directly to each "refurbished" ball the legend "USED & REFURBISHED BY SECOND CHANCE" or "USED AND REFURBISHED BY GOLFBALLSDIRECT.COM." In these statements, the terms "Second Chance" and "Golfballsdirect.com" refer to businesses of Nitro. *Order* at 3. Some, but not all, of the refurbished balls also bear a Nitro trademark. Nitro's refurbished balls are packaged in containers displaying the following disclaimer:

ATTENTION USED/REFURBISHED GOLF BALLS: The enclosed contents of used/refurbished golf balls are USED GOLF BALLS. Used/Refurbished golf balls are subject to performance variations from new ones. These used/refurbished balls were processed via one or more of the following steps: stripping, painting, stamping and/or clear coating in our factory. This product has NOT been endorsed or approved by the original manufacturer and the balls DO NOT fall under the original manufacturer's warranty.

According to Nitro, there is a large market for used golf balls. In 2001, Nitro saw annual sales of approximately $10 million, including $4.8 million for refurbished balls. *Id.*

Nitro originally filed suit against Acushnet in the United States District Court for the Southern District of Florida, alleging, *inter alia*, unfair competition. Shortly thereafter, Acushnet filed suit in the United States District Court for the Central District of California, alleging that Nitro infringed a number of Acushnet's patents and violated federal and state trademark laws. Nitro amended its complaint in the Florida case to seek a declaratory judgment that it did not infringe Acushnet's patents. The California action was subsequently transferred to Florida, and the actions were consolidated.

On April 23, 2002, Acushnet moved for a preliminary injunction on its trademark and patent claims. As to the trademark claims, Acushnet concedes that it has no trademark claim with respect to "recycled" balls and does not object to those sales. As to the "refurbished" balls, however, Acushnet asserts that "Nitro's refurbishing process produces a golf ball that bears no resemblance to a genuine Acushnet product in performance, quality or appearance" and that "Nitro's refurbishing process so alters the basic composition of Acushnet's golf balls that 'it would be a misnomer to call the article by its original name.'" Following oral argument, the dis-

trict court on August 9, 2002, issued its *Order*, concluding that Acushnet had failed to show a likelihood of success on the merits and denying preliminary injunctive relief on both the trademark and the patent law claims.

Before this court, Acushnet seeks review of the denial of its motion for preliminary injunction only as to its trademark infringement and dilution claims. We have jurisdiction pursuant to 28 U.S.C. §§ 1292(c)(1) and 1295(a)(1).

## DISCUSSION

### Standard of Review

■ This court generally reviews procedural matters under the law of the regional circuit in which the district court sits. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 987 (Fed.Cir.1993). Additionally, we defer to the law of the regional circuit when addressing substantive legal issues over which we do not have exclusive subject matter jurisdiction. *See id.* In this case, we defer to the law of the Eleventh Circuit in reviewing the district court's denial of Acushnet's motion for preliminary injunctive relief from the alleged trademark infringement and dilution.

■ The Eleventh Circuit reviews a district court's grant or denial of a preliminary injunction for abuse of discretion. *Davidoff & CIE, SA v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir.2001); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998). Under the abuse of discretion standard, a reviewing court "must affirm unless [it] at least determine[s] that the district court has made a 'clear error of judgment,' or has applied an incorrect legal standard." *CBS Broadcasting, Inc. v. EchoStar Commun. Corp.*, 265 F.3d 1193, 1200 (11th Cir.2001) (citations omitted). A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) that there is a substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner outweighs whatever damage the injunction may cause to the alleged infringer; and (4) that the injunction, if issued, would not be adverse to the public interest. *Id.* It is well established in the Eleventh Circuit that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to all four elements." *Davidoff*, 263 F.3d at 1300 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc)).

■ To succeed on the merits of a trademark infringement claim, a plaintiff must show that the defendant used the mark in commerce without its consent and "that the unauthorized use was likely to deceive, cause confusion, or result in mistake." *McDonald's Corp.*, 147 F.3d at 1307. The determination generally boils down to the existence of "likelihood of confusion." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir.1986).

## ANALYSIS

### I. Acushnet's Contentions

Acushnet argues that the district court abused its discretion in denying its motion for preliminary injunction on the pleaded trademark infringement issues by applying an incorrect legal standard, by erroneously relying on a non-precedential consent judgment between Acushnet and an unrelated third party, and by making erroneous findings of fact and applications of law to fact, in concluding that Acushnet failed to show a likelihood of success on the merits of its trademark infringement and dilution claims. Acushnet requests that this court reverse the judgment of the district court, find that a likelihood of suc-

cess on the merits has been shown, and remand with directions to enter the sought preliminary injunction or for further proceedings consistent with our opinion. We address each of Acushnet's arguments in turn.

## II. Trademark Infringement

### A. The Applicable Standard

Acushnet first argues that the district court failed to apply the correct legal standard to the trademark infringement claim. Acushnet asserts that the district court misapplied *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), and Eleventh Circuit law by failing to extend the "material difference" test applied in the context of altered new goods in *Davidoff,* 263 F.3d at 1302, to the used and refurbished goods involved in the present case. Acushnet also contends that the district court's reliance on *Champion* was misplaced because the refurbished goods in this case differed from the original goods not by the ordinary wear and tear expected in used products but by the refurbishing actions taken by Nitro. Acushnet argues that the "undisputed evidence" presented, when analyzed under the correct legal standard, would have established the requisite likelihood of success on the merits to warrant a preliminary injunction, and that denial of the requested preliminary injunction was an abuse of discretion. We disagree and find no abuse of discretion.

To succeed in its request for a preliminary injunction on its trademark infringement claim, Acushnet must show, *inter alia,* a likelihood of success on the merits. This means that it must show a likelihood of success on its claim that the sale by Nitro of its refurbished golf balls bearing re-applied Acushnet trademarks is likely to cause confusion. In considering this issue, the district court looked to *Champion*—clear precedent in the used goods con-

text—and concluded, on the record presented at this preliminary stage, that the differences between Acushnet's new golf balls and Nitro's refurbished golf balls were not so great as to be a misnomer and that it was not an act of infringement, warranting preliminary injunctive relief, for Nitro to re-apply Acushnet's trademarks to the Acushnet balls refurbished by Nitro and to re-sell those balls in packaging identifying them as used or refurbished.

 The Eleventh Circuit looks to the following factors in assessing a likelihood of confusion in trademark cases:

1. Type of mark
2. Similarity of mark
3. Similarity of the products the marks represent
4. Similarity of the parties' retail outlets (trade channels) and customers
5. Similarity of advertising media
6. Defendant's intent
7. Actual confusion

*Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir.1999); *cf. Lipscher v. LRP Publ'ns, Inc.,* 266 F.3d 1305, 1313–14 (11th Cir. 2001) (noting that not all *Frehling* factors are relevant in each case). In the present case, the dispute centers around the differences between new and refurbished Acushnet golf balls, thus implicating the "similarity of the products" factor. Specifically, the question presented is the propriety of the re-application by Nitro of the Acushnet trademark, without Acushnet's consent, to genuine Acushnet golf balls that have been used, subjected to Nitro's refurbishing process, and then re-sold by Nitro as refurbished balls.

The district court assessed that question by applying the standards applied to used and refurbished goods by the Supreme Court in the *Champion* case. The district

court cited *Davidoff* but did not directly apply the "material differences" test articulated in that case. Acushnet urges us to conclude that the district court erred in not recognizing from *Davidoff* that the "material differences" standard used to assess likelihood of confusion in the sale by unrelated parties of new, genuine trademarked goods would also be used in the Eleventh Circuit as the standard for assessing trademark infringement in the sale of used, genuine trademarked goods. Acushnet argues from this that had the district court applied the *Davidoff* test, it would have found the refurbished golf balls sold by Nitro and bearing the Nitro re-applied Acushnet trademarks to be "materially different" from the original trademarked goods and thus an infringement of Acushnet's trademarks, warranting preliminary injunctive relief. Nitro argues that *Davidoff* is simply inapplicable, and attempts to distinguish this case from *Davidoff,* based on the fact that *Davidoff* considered new goods and because *Davidoff* did not include disclaimers. Nitro also attempts to distinguish the cases cited by Acushnet in support of adoption of the *Davidoff* "material differences" standard; namely, *Rolex Watch USA, Inc. v. Michel,* 179 F.3d 704 (9th Cir.1999), *Rolex Watch USA, Inc. v. Meece,* 158 F.3d 816 (5th Cir.1998), and *Intel Corp. v. Terabyte International, Inc.,* 6 F.3d 614 (9th Cir.1993).

Under 15 U.S.C. §§ 1114(1) and 1125(a)(1), any person who uses the trademark of another, without consent, in a manner that is likely to cause confusion, mistake, or to deceive may be liable in a civil action for trademark infringement. *McDonald's Corp.,* 147 F.3d at 1307. In the *Champion* case, a seminal opinion on the use of trademarks on used goods, the accused infringer collected genuine used Champion spark plugs, repaired and reconditioned the spark plugs, painted the spark plugs for aesthetic reasons, and resold the spark plugs, each labeled "Re-

newed." 331 U.S. at 126, 67 S.Ct. 1136. The issue before the Supreme Court was simply whether the lower courts erred in not requiring the accused infringer to remove Champion's trademark name from the repaired and reconditioned spark plugs. *Id.* at 128, 67 S.Ct. 1136. The Supreme Court acknowledged that, in some cases, used and repaired goods can be sold under the trademark of the original manufacturer, without "deceiv[ing] the public," so long as the accused infringer had attempted to restore "so far as possible" the original condition of the goods and full disclosure is made about the true nature of the goods, for example, as "used" or "repaired." *Id.* at 129–30, 67 S.Ct. 1136. In *Champion,* the Supreme Court stated that "[w]hen the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth." *Id.* at 129, 67 S.Ct. 1136.

The Supreme Court recognized that this standard results in the second-hand dealer getting some advantage from the trademark; however, this windfall is "wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product." *Id.* at 130, 67 S.Ct. 1136 (citing *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924)). This advantage is not inconsistent with the stated purposes of the Lanham Act. In passing the Lanham Act, Congress noted that the purpose was "to protect legitimate business and consumers of the country." 92 Cong. Rec. 7524 (1946). To fulfill this purpose, the Act "protect[s] the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get." S.Rep. No. 79–1333 at 3 (1946), *reprinted in* 1946 U.S.S.C.A.N. 1274. Further, the owner of the trademark must have the energy and effort he expended in

building goodwill in his trademark protected from misappropriation. *Id.* However, so long as the customer is getting a product with the expected characteristics, and so long as the goodwill built up by the trademark owner is not eroded by being identified with inferior quality, the Lanham Act does not prevent the truthful use of trademarks, even if such use results in the enrichment of others.

The *Champion* court, while concluding that the facts of that case did not establish a likelihood of confusion, cautioned that there are limits on the use of a trademark by another on a used or repaired item. The Supreme Court explained that "[c]ases may be imagined where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words 'used' or 'repaired' were added." 331 U.S. at 129, 67 S.Ct. 1136. In *Champion,* the repair was such that it "[did] not give [the product] a new design," and the accused infringers had sought to restore the product "so far as possible, [to its] original condition," *id.* Thus, no infringement was found.

Similar to the admonition expressed by the Supreme Court in connection with the sale of refurbished goods in *Champion,* the Eleventh Circuit in *Davidoff* cautioned that there are limits to the permissible uses of a trademark by re-sellers even on new, genuine trademarked goods. In *Davidoff,* the Eleventh Circuit found infringement in the use of a trademark by a party unrelated to the trademark owner for new, genuine trademarked goods sold in packaging that had been altered. In that case, accused infringer PLD purchased genuine bottles of Davidoff's perfumes and, prior to re-sale, etched and altered the bottles to remove batch code information from the bottoms of the bottles. Davidoff sought to end this practice, arguing that the etching of the bottles altered the product in a way that caused consumer confusion. The Eleventh Circuit agreed, holding that the removal of the batch code information was a material alteration that would affect a consumer's decision whether to purchase the product in question.

The fundamental question examined in *Davidoff* was the same question considered in *Champion*—likelihood of confusion—but presented in the context of re-sales of new goods. The context is important because consumers of new goods have different expectations than consumers of used goods. For new goods, any variation of the product from a new condition—even as relatively modest as the obliteration of a name or batch number from the bottom of a container—may signal imitation, counterfeiting, falsity or some other irregularity affecting a customer's decision whether to purchase the product. *See, e.g., Societe Des Produits Nestle S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 644 (1st Cir.1992) (finding such differences as configuration, i.e., the number of different shapes of chocolates, and packaging, i.e., whether the packaging is shiny or matte and the colors of the packaging, to be material). For new goods, consumers are likely to be confused by the presence of such "material differences." *Davidoff,* 263 F.3d at 1302.

For used or refurbished goods, customers have a different expectation. They do not expect the product to be in the same condition as a new product. *Champion,* 331 U.S. at 129, 67 S.Ct. 1136. There is an understanding on the part of consumers of used or refurbished products that such products will be degraded or will show signs of wear and tear and will not measure up to or perform at the same level as if new. *Id.* at 129–30, 67 S.Ct. 1136. For used or refurbished products, consumers are not likely to be confused by—and indeed expect—differences in the goods compared to new, unused goods. *Id.* Thus,

the tests applied to assess likelihood of confusion by courts will not necessarily be the same when determining trademark infringement in the resale of altered new goods and when considering trademark infringement in the resale of used and refurbished goods.

Both *Champion* and *Davidoff* sought to define the boundaries of when the use of a trademark on genuine trademarked goods is no longer permitted. The tests applied in both cases focus on the similarities and differences between the accused infringing goods and the genuine trademarked goods and assess the likelihood of confusion resulting from contemporaneous sales of those goods.

The *Davidoff* test looks to the effect on a consumer's decision to purchase of differences in an altered or modified new product from the original. It is a reasonable and workable test of the likelihood of confusion and the loss of goodwill represented by the trademark applied to the product, given consumer expectations as to the nature and quality of new products as offered for sale. The test has been adopted and applied to new, genuine trademarked goods in the First, Second, Third, Fifth, and Ninth Circuits. *See, e.g., Nestle*, 982 F.2d at 644 (1st Cir.) (finding material differences based on quality control, composition, configuration, packaging, and price); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir.1987) (finding material differences where an imported doll comes with foreign language "adoption papers" and is not permitted to be "adopted" domestically); *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir.1998) (finding material differences where quality control measures differ); *Martin's Herend Imports Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1302 (5th Cir. 1997) (finding material differences when the trademark holder had chosen to sell only selected pieces in the United States and the accused infringer was selling other, genuine pieces in the United States); *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1087 (9th Cir.1998) (finding material differences where quality control measures differ).

The *Champion* Court recognizes that consumers do not expect used or refurbished goods to be the same as new goods and that for such goods, "material differences" do not necessarily measure consumer confusion. According to *Champion*, what is more telling on the question of likelihood of confusion in the context of used goods is whether the used or refurbished goods are so different from the original that it would be a misnomer for them to be designated by the original trademark. We see no basis to conclude that the district court's reliance on *Champion* was improper.

The district court in this case properly assessed likelihood of confusion in concluding: (1) that on the evidence before it, the differences in the goods were nothing more than what would be expected for used golf balls; (2) that it was therefore not a misnomer to apply the Acushnet mark to the used Acushnet balls; and (3) that Acushnet had not established a likelihood of success on the merits of its trademark "likelihood of confusion" case. This is all that was required, and there is no basis to conclude that the district court applied the wrong test or otherwise abused its discretion. This court need not predict whether the Eleventh Circuit would apply *Davidoff* to used goods. It would only be necessary to make such a prediction if application of the "material differences" test must be satisfied in all cases involving genuine trademarked goods. But *Davidoff* does not go that far and cannot be read to supplant the statutory "likelihood of confusion" test with a "material differences"

test applicable to all cases involving the resale of genuine trademarked goods, both new and used.

Alternatively, Acushnet argues that the district court's reliance on *Champion* is misplaced.[1] Acushnet attempts to distinguish *Champion,* arguing first that Nitro does not restore "so far as possible" the used balls to their original condition, but rather masks the balls' condition, and second, that by masking rather than restoring, Nitro makes it more likely that customers will associate inferior performance with Acushnet. Acushnet argues that, although there was repainting of the spark plugs in *Champion,* such painting was merely cosmetic. Acushnet contends that the district court failed to recognize that Nitro's process of stripping and repainting was more than cosmetic and changed the fundamental attributes of the reprocessed balls. Moreover, Acushnet argues that it is Nitro's refurbishing process, not normal wear and tear, that degraded the quality of Nitro's used golf balls. Acushnet thus asserts that *Champion* is distinguishable on its facts and should not apply. We disagree with Acushnet's distinctions.

First, while it is true that the spark plugs were repainted in *Champion,* the reconditioning also involved removing burned and pitted portions of the center electrodes, welding new metal to the side electrodes, wearing away the plug's porcelain insulators through sandblasting, and then cleaning and painting the spark plug. *Champion Spark Plug Co. v. Sanders,* 156 F.2d 488, 489 (2d Cir.1946). The refurbishing process in *Champion,* then, was not merely cosmetic, and cannot be distinguished from the present case on that

basis. Second, *Champion* also held that the source of any inferiority, whether the reconditioning or the refurbishing, is irrelevant, stating that inferiority is immaterial as long as the original manufacturer "is not identified with the inferior qualities of the product *resulting from wear and tear or the reconditioning." Champion,* 331 U.S. at 130, 67 S.Ct. 1136 (emphasis added). In the *Champion* case, the district court noted that there was no proof whether the inferior qualities stemmed from either "wear and tear prior to the discarding of the plug by the original user, or to the process of repair as conducted by the defendants." *Champion Spark Plug Co. v. Sanders,* 61 F.Supp. 247, 248–49 (E.D.N.Y. 1945). Acushnet's distinction on this point is similarly untenable.

In this case, the district court carefully considered the extent of the alterations made by Nitro. *See Order* at 8–9 (citing *Rolex Watch USA, Inc. v. Michel,* 179 F.3d 704) ("[w]hether the modifications made to the product resulted in a new product"); *Intel,* 6 F.3d at 619. The district court also looked to a number of factors, outlined by the Ninth Circuit, to determine if the alterations resulted in a new product. *Order* at 9 ("These factors 'include the nature and extent of the alterations, the nature of the device and how it is designed ..., whether a market has developed for service or spare parts ... and, most importantly, whether end users of the product are likely to be misled as to the party responsible for the composition of the product.' *Karl Storz Endoscopy-America, Inc. v. Surgical Technologies, Inc.,* 285 F.3d 848, 856–57 (9th Cir.2002)." (alterations in original)). The district

---

1. The dissent also attempts to distinguish *Champion* based on the notion of simply reselling versus reapplication of trademarks. *See* Dissent, *infra* at 1369 (stating that the *Champion* Court "ratified the resale of used spark plugs still bearing the Champion

name"). However, this distinction overlooks the fact that the refurbisher in Champion, at the very least, applied or reapplied Champion's trademark to its cartons and packaging. *Champion,* 331 U.S. at 126, 67 S.Ct. 1136.

court also considered: (a) evidence proffered by Nitro that the performance differences were not as extensive as claimed by Acushnet; (b) evidence of the use of disclaimers; and (c) evidence from customers of both Acushnet and Nitro on the question of confusion. *Order* at 9–12. On this record, the district court concluded that "Acushnet has not presented sufficient evidence to support its claim that the golf balls are so extensively repaired that they cannot be truly labeled with the Titleist marks." *Id.* at 9–10.

Because the district court properly considered the *Frehling* factors; fully and carefully assessed the differences between Acushnet's new golf balls and Nitro's refurbished golf balls in determining likelihood of confusion; and correctly looked to *Champion* for the applicable legal standard, we find no abuse of discretion in the district court's denial of Acushnet's requested preliminary injunction based on its trademark infringement claim.

### B. The *Birdie* Decision

Acushnet argues that the district court abused its discretion in relying on a consent decree between Acushnet and an unrelated used golf ball vendor, Birdie Golf Ball Co., Inc. Acushnet contends that the *Birdie* consent decree predated the *Davidoff* case, was based on a substantially different record from the facts in this case, and is not controlling here. In our view, Acushnet overstates the extent to which the district court relied on *Birdie*. The district court noted the *Birdie* case, but in doing so simply reported that a refurbishing process similar to that used by Nitro was at issue in that case and was permitted by Acushnet to continue so long as the balls were clearly marked "USED/RE-FINISHED BY BIRDIE GOLF." *Order* at 11. We do not discern that the district court's reference to *Birdie* was determinative of the decision to deny preliminary injunctive relief or that the reference to

that case was anything other than confirmation of the conclusion properly reached by the district court in its analysis of the *Frehling* factors and its application of the *Champion* test. We find no abuse of discretion in the district court's reference to *Birdie.*

### C. The Factual Findings

Acushnet makes a number of arguments that can be characterized as disagreements with the district court's findings of fact or the application of law to fact. In particular, Acushnet argues that the district court placed too much weight on the disclaimers Nitro placed on the packaging and golf balls; that the district court erroneously found that Acushnet and Nitro sell balls in different channels of trade; and that the district court failed to find customer confusion based on the evidence presented. A trial court's findings of fact must be upheld unless clearly erroneous. *Swatch Watch, S.A. v. Taxor, Inc.,* 785 F.2d 956, 958 (11th Cir.1986). We have carefully considered Acushnet's arguments and the district court's findings of fact and discern no clear error.

### III. Dilution

■ Acushnet also appeals the district court's denial of the motion for preliminary injunction on its dilution claim. The district court determined that Acushnet's marks are famous, indicating that there "is no dispute concerning the strength of Acushnet's trademarks." *Order* at 7. The district court, however, did not find Acushnet's evidence and legal arguments to be sufficient to establish that Nitro was lessening the capacity of Acushnet's trademarks to serve as source indicators and damaging Acushnet's business reputation and goodwill. *Id.* at 14. This outcome is consistent with the Supreme Court's decision in *Moseley v. V Secret Catalogue, Inc.,*

537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003), issued during the pendency of this case before our court.

In *Moseley,* the lingerie retailer, VICTORIA'S SECRET, sued Victor and Cathy Moseley, proprietors of a store named "Victor's Little Secret," for trademark dilution, among other claims. The Moseleys sold, through the store, "a wide variety of items, including adult videos, 'adult novelties,' and lingerie." 123 S.Ct. at 1120. The district court found that the Moseleys did not challenge the claim that the mark VICTORIA'S SECRET was famous, and found dilution based on tarnishment. *Id.* The Sixth Circuit affirmed, basing its determination of dilution on both tarnishment and blurring. *Id.* at 1120–21. The Supreme Court, however, reversed, holding that the Federal Trademark Dilution Act, 15 U.S.C. § 1127, "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution." 123 S.Ct. at 1124. Because, in the *Moseley* case, there was "a complete absence of evidence of any lessening of the capacity of the VICTORIA'S SECRET mark to identify and distinguish goods or services sold in Victoria's Secret stores or advertised in its catalogs," the Court reversed the Sixth Circuit Court's finding of dilution. *Id.* at 1125.

In arguing the dilution claim before us, Acushnet reiterates the conclusory statements it made before the district court, with little more. These arguments fail to establish that the district court erred or abused its discretion. Moreover, we find no basis to conclude that Acushnet meets the requirement of "a showing of actual dilution" under *Moseley.* Therefore, we affirm the district court's denial of the requested preliminary injunction based on trademark dilution.

## CONCLUSION

The district court did not abuse its discretion, commit an error of law, or seriously misjudge the evidence in concluding that Acushnet failed to show a reasonable likelihood of success on the merits of its trademark and dilution claims and in denying Acushnet's motion for a preliminary injunction based thereon. We therefore affirm.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

I can think of nothing more destructive of the value of a famous trademark than for the law to permit unauthorized persons to re-affix the mark to a product that is so badly cut, scarred, dented, discolored, and bruised that its defects have to be concealed before it can be resold as "used"—and then, with the scars hidden and the surface repainted to look new, the product is resold with the benefit of the re-affixed trademark and its reputation for quality and performance. The court today holds that the trademark owner cannot object to this unauthorized, uncontrolled affixation of its famous Titleist7 mark, provided that the package is labeled "used/refurbished" and a disclaimer is presented.

Neither trademark law nor any other law removes from the trademark owner control of the quality of the goods and use of the mark. To the contrary, the law requires the holder of the trademark to control both the use of the mark and the quality of the goods to which it is affixed, on pain of losing the mark as a trademark. The consequence of this law is that, whether on grounds of infringement, dilution, or tarnishment, Acushnet is likely to succeed on the merits of its case. From the denial of the requested preliminary injunction I must, respectfully, dissent.

## DISCUSSION

This case does not relate to the resale of used golf balls, washed and buffed and

repackaged, bearing the original trademark. Acushnet is not objecting to that part of Nitro's activities. However, when the balls are so badly scarred or cut that they must be repainted and the damage concealed, the repainting also obscuring the original trademark, surely the trademark owner has the right to prevent reapplication of its trademark (in identical script) to damaged goods covered with shiny new paint, goods of unsupervised quality but bearing the famous original trademark.

Trademark law requires that the trademark owner police the quality of the goods to which the mark is applied, on pain of losing the mark entirely. Professor McCarthy explains:

> Sometimes a mark becomes abandoned to generic usage as a result of the trademark owner's failure to police the mark, so that widespread usage by competitors leads to a generic usage among the relevant public, who see many sellers using the same word or designation.

J. Thomas McCarthy et al., 2 *McCarthy on Trademarks and Unfair Competition* § 17:8, at 17–10 (4th ed., Rel.# 21, 3/2002). Yet here the trademark applier is unlicensed, the quality out of the control of the owner of the mark, and the flaws concealed from the consumer.

These are fundamental principles of trademark law. The Federal Circuit, applying this law, has itself imposed loss of trademark rights based on inadequate control of use of a mark by others. *See BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 35 USPQ2d 1554 (Fed.Cir.1995) (the "Walking Fingers" mark became generic because AT & T allowed others to use it). Although the law permits resale of used and refurbished products, it does not require the owner of the trademark to permit its use on inferior goods with concealed damage, simply by marking the goods as "used/refurbished." The presence of a famous trademark on such goods is not an indication of origin and quality, but a trap for the consumer.

A trademark serves as an assurance of quality, consistency, and reliability, by indicating the source and control of the product bearing the mark:

> However, the quality function [of a trademark] does not replace the source function: it stands alongside it. In fact, one could accurately state that the quality theory is merely a facet of the older source theory. That is, the source theory has been broadened to include not only manufacturing source but also the source of standards of quality of goods bearing the mark: "[A] mark primarily functions to indicate a single quality control source of the goods or services." Under both the source and quality rationales, unity of source of manufacture or control appears essential.

1 *McCarthy, supra*, § 3:10, at 3–20. The law both permits and requires control by the trademark owner, even when the mark is licensed:

> Licensing a mark without adequate control over the quality of goods or services sold under the mark by the licensee may cause the mark to lose its significance as a symbol of equal quality-hence, abandonment.

*Id.*, § 17:6, at 17–9.

I repeat, the question is not whether Nitro can resell used golf balls, perhaps washed and buffed; the question is whether the owner of the Titleist7 and other famous trademarks can prevent reapplication of these trademarks to goods that have been materially changed. In explaining Nitro's operations, its President stated:

> The balls that are in sufficiently good condition to resell without refurbishing are then identified. Those golf balls are re-packaged and resold as used golf balls, i.e., "recycled" golf balls.

Acushnet does not object to Nitro's resale of these balls with the original trademarks. This case is about the next group, as Nitro's president further explained:

> The remaining balls, which suffer from one or more of the following detriments, e.g., scuff marks, cart path marks, tree marks, lack of clear coat, discoloration, etc., are sent to the final quality control sort.... The balls are refurbished by removing the base paint coat and the clear coat from the balls, which also has the effect of removing the marking from the balls....
>
> Nitro then reapplies the base coat paint (on those balls that originally had a base coat). The balls are then re-stamped with the appropriate markings.... Nitro re-stamps the precise model type only for those models that its consumers have expressed a demand, e.g., Titleist Pro V1's.... Following the re-stamping process, Nitro re-applies the clear coat.

The district court found Nitro's process not to be "intrusive," in that it "does not remove the dimples on the balls, nor does it take off the cover of the ball." The issue, however, is Nitro's right to re-apply the Titleist7 and Pro V–17 trademarks to the repainted balls.

When goods have lost their identity and their quality, the trademark owner can not be forced to permit re-application of the original trademark to the doctored product. That is a reproach to the most fundamental principles of trademark law. *See Bulova Watch Co. v. Allerton Co.,* 328 F.2d 20, 24 (7th Cir.1964) ("substitution of a different crown and case by defendants results in a different product," enjoining

use of the trademark "Bulova" on the re-cased watches).

There was evidence that these damaged balls did not have the characteristics of the original. Although Nitro argues that the difference is not great, that is not the issue. Trademarks are an indication of quality, on which the consumer can rely. The consumer is no less deceived if he does not know that the product is inferior, or if the extent of the inferiority is not great. The trademark owner is entitled, and required, to control the quality of the product:

> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark.... For this purpose the actual quality of the goods is irrelevant: it is the control of quality that a trademark holder is entitled to maintain.

*El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395, 1 USPQ2d 1016, 1017 (2nd Cir.1986).

Even if the consumer has digested the notice on the Nitro package,[1] the severity of the concealed defects are not known to the consumer, who will not know whether the refurbished ball has been stripped and painted, whether the balance is distorted, whether the all-important dimples are encumbered with fresh paint. The consumer will not know that the Titleist7 mark was re-applied to a ball that was so badly damaged that the original marking was lost.

---

1. The court found that the packaging of Nitro's golf balls now bears the following notice:

 ATTENTION USED/REFURBISHED GOLF BALLS. The enclosed contents of used/refurbished golf balls are USED GOLF BALLS. Used/refurbished golf balls are subject to performance variations from new ones. These used/refurbished balls were

 processed via one or more of the following steps: stripping, painting, stamping and/or clear coating in our factory. This product has NOT been endorsed or approved by the original manufacturer and the balls DO NOT fall under the original manufacturer's warranty.

 *Order* at 12.

Although there was discussion at trial of the issues of section 1114 and section 1125 of the Trademark Act, there is prima facie infringement when a trademark is applied by unauthorized persons to an unlicensed product that has not met the quality standards of the trademark under the control of the owner of the mark. The law protects not only the trademark owner but also the consumer, for not only does an inferior product injure the Titleist7 and Pro V–1 7 reputation, but the consumer is deprived of the quality that the law demands of the trademark owner. Acushnet argues, with cogency, that inferior performance is more likely to be attributed to the Titleist7 source than to the refurbisher, for the degree of "refurbishment" is not specified, and the balls as repainted are clean and conceal their defects. This is not the same situation as in *Champion Spark Plug v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), where the Court ratified the resale of used spark plugs still bearing the Champion name. The Court recognized that the trademark had been infringed, and that the issue was adequacy of the notice, considering "the equities of the case." In *Champion* there was no issue of concealed defects; the Court permitted retention of the identity of the original plugs "so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer." *Id.* at 130, 67 S.Ct. 1136.

My colleagues err in their ruling that the notice that the balls are used/refurbished "protects the public so it may be confident that, in purchasing a product bearing a particular trademark which it favorably knows, it will get the product which it asks for and wants to get." Maj. op. at 9. When the defects are concealed, that is not "full disclosure about the true nature" of the golf balls as the panel majority holds. Concealment is the antithesis of full disclosure. In purchasing a used golf ball that has been repainted, the consumer is not provided with knowledge of concealed damage as well as surface changes. When the consumer purchases a used golf ball bearing the Titleist7 mark, the purchaser does not know if this is an almost-new golf ball that went from tee to lake on the first stroke, or a ball so badly cut that it was discarded. This is not the "full disclosure" accommodated by *Champion.* The owner of the Titleist7 mark is surely entitled to prevent re-application of the mark to golf balls whose repainting covers the original mark.[1] The Court in *Champion* held that "the nature of the article involved and the characteristics of the merchandising methods used to sell it" are important considerations in devising an appropriate notice and disclaimer. 331 U.S. at 130–31, 67 S.Ct. 1136. The nature of the refurbishment of a used spark plug is visible; the nature of the damage to a repainted golf ball is invisible, and any performance-deteriorating defects are permanently removed from view.

In an ever more complex commercial economy, it is increasingly important to preserve standards of quality and confidence. Trademark law carries this burden. The record states that the Titleist7 balls are the premium balls in this market, and are recognized by the golfing public as of high and consistent quality and dependability. The producer of these products is entitled by law to protect the reputation and the value of its marks. Consumer expectations of quality should not be thwarted by an inappropriate balance of interests.

A trademark owner has the absolute right to prevent others from affixing the

1. There was also evidence that Nitro applied the Titleist7 mark to balls of other makers, when the original mark was obscured by repainting.

mark with neither license nor quality control by the trademark owner. This is not a case of likelihood of confusion or dilution through the use of similar marks; it is a case of unauthorized use of an original mark on goods that have been invisibly altered, such that the use approaches the counterfeit. The re-application of the obliterated trademark is not simply information about the original source of used golf balls; it is an unauthorized exploitation of the mark, identifying the original manufacturer with the disguised product. The role of the trademark is its assurance of quality, and its value depends on the consistent quality of the product that bears the mark. Again quoting Professor McCarthy:

> [T]he chief function of a trademark is a kind of 'warranty' to purchasers that they will receive, when they purchase goods bearing the mark, goods of the same character and source, anonymous as it may be, as other goods previously purchased bearing the mark that have already given the purchaser satisfaction.

1 *McCarthy, supra,* § 3:10, at 3–20, 3–21 (quotation marks and citations omitted).

The trademark owner is required by law to police and preserve that quality; it cannot be deprived of that right and obligation. From the panel majority's contrary ruling and denial of the requested injunction I must, respectfully, dissent.

