THIS OPINION IS
A PRECEDENT OF
THE TTAB

Oral Hearing: July 10, 2007        Mailed: February 11, 2008


**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Spirits International N.V.
_____

Serial No. 74382759
_____

Bingham B. Leverich and Marie A. Lavalleye of Covington & Burling LLP for Spirits International N.V.

Geoffrey Fosdick, Trademark Examining Attorney, Law Office 111 (Craig D. Taylor, Managing Attorney).
_____

Before Holtzman, Rogers and Bergsman, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:


Spirits International N.V. (applicant) has filed an application to register the mark MOSKOVSKAYA (in standard character form) for "vodka" in Class 33.[1]

---

[1] Serial No. 74382759, filed April 22, 1993, based on an allegation of a bona fide intention to use the mark in commerce. Applicant claims ownership of Registration No. 0860268 for the mark MOSKOV (stylized) for vodka. The application, originally filed by Monsieur Henri Wines, Ltd, has been assigned to the present applicant, Spirits International N.V.

The trademark examining attorney ultimately refused registration on the ground that the mark is primarily geographically deceptively misdescriptive of the goods under Sections 2(a) and 2(e)(3) of the Trademark Act.

Applicant has appealed from this refusal. The appeal has been briefed, and an oral hearing was held.

Before proceeding to the merits, we address a procedural matter and clarify the proper statutory basis for the refusal. This application was filed prior to the NAFTA implementation date of December 8, 1993 and the corresponding amendment of the Trademark Act to move the category of primarily geographically deceptively misdescriptive marks from Section 2(e)(2) into the newly created Section 2(e)(3). Compare Trademark Act § 2(e)(2), 15 U.S.C. § 1052(e)(2), 102 Stat. 3037 (Nov. 16, 1988), *with* 15 U.S.C. § 1052(e)(2)-(3), 107 Stat. 2057 (Dec. 8, 1994). Thus, on August 31, 1993, when the application was first examined, the examining attorney refused registration under Section 2(e)(2) of the Trademark Act on the ground that the mark was either primarily geographically descriptive or primarily geographically deceptively misdescriptive, depending on the origin of the goods. The application was then suspended on March 28, 1994 pending disposition of a number of earlier-filed applications that were potential citations under Section 2(d) of the Trademark Act against the involved application. Proceedings were subsequently

resumed 12 years later on March 13, 2006, once the potential citations had become abandoned, at which time the examining attorney issued a final refusal to register on the ground that the mark was either primarily geographically descriptive or primarily geographically deceptively misdescriptive. However, the examining attorney only cited Section 2(e)(2) as the basis for the refusal, and also for the first time argued, in effect, that the mark was geographically deceptive, a refusal which had not been previously made. Applicant then filed a notice of appeal, and concurrently therewith a request for reconsideration on September 1, 2006 wherein applicant construed the final refusal as one based on Section 2(e)(3) of the Act. The examining attorney denied the request for reconsideration and continued the final refusal "based upon Trademark Act Sections 2(a)/2(e)(3)."

First, although the examining attorney in the final refusal did not cite the proper statutory authority for either geographic deceptiveness under Section 2(a) or primary geographic deceptive misdescriptiveness under Section 2(e)(3), he effectively applied the proper substantive law for a refusal on those grounds.[2] Furthermore, applicant, in its request for reconsideration,

---

[2] See In re California Innovations Inc., 329 F.3d 1334, 66 USPQ2d 1853, 1858 (Fed. Cir. 2003) ("...there are identical legal standards for deception in each section..."). It is clear that the refusal is based on the "deceptiveness" provision of Section 2(a) and that registration is not being refused on the ground that the mark is a "geographical indication" for spirits under Section 2(a).

viewed the examining attorney's omission of a reference to Section 2(e)(3) as simply a "typographical error" (Req. for Recon., p. 2, n. 1) and applicant acknowledged that the test under Section 2(e)(3) in accordance with *California Innovations* requires a showing of materiality. Under the circumstances, we consider the proper refusal to be under Section 2(e)(3), as further explained below.[3]

Second, because an appeal may only be taken after a final refusal or a second refusal on the same ground (see Trademark Rule 2.141), in view of the intervening statutory amendment and the Federal Circuit's interpretation thereof in *California Innovations*, the initial refusal to register on the ground of primary geographical deceptive misdescriptiveness is deemed to be based upon amended Section 2(e)(3) and thus the appeal of the final refusal (issued over 12 years later) is not premature but instead is clearly timely. There is no prejudice to applicant

---

[3] Based on the Court's instructions in *California Innovations*, and its construction of Sections 2(a) and 2(e)(3), the Board, in In re South Park Cigar Inc., 82 USPQ2d 1507, 1509 (TTAB 2007), determined that the appropriate refusal involving "an allegedly geographically deceptive mark" falls exclusively under Section 2(e)(3). The only residual effect of pre-NAFTA law lies in Section 2(f) of the Act. See In re Beaverton Foods Inc., 84 USPQ2d 1253 (TTAB 2007). As amended by NAFTA, Section 2(f) contains a grandfather clause that permits registration under Section 2(f) of geographically deceptively misdescriptive marks "which became distinctive of the applicant's goods in commerce before [December 8, 1993]." This application was filed under the intent-to-use provision of the Trademark Act and applicant has not yet filed an allegation of use of the mark. In any event, applicant is not seeking registration under Section 2(f). Thus, this amendment to the Trademark Act has no bearing on this case.

from such as it clearly construed the final refusal as being pursuant to amended Section 2(e)(3) in any event.

We turn then to the merits of this case. We note that the examining attorney, having made alternative refusals under Section 2(e)(2) and 2(e)(3), inquired in his final action about the origin of applicant's goods. Applicant responded, in its request for reconsideration, that the goods will not originate in Moscow. Applicant submitted the declaration of Beatrice Sfondylia, attorney and head of the IP Department of S.P.I. TM Services SA (applicant's sister company), wherein Ms. Sfondylia states that applicant's vodka "will not be manufactured, produced or sold in Moscow and will not have any other connection with Moscow." The examining attorney then maintained the final refusal solely on the ground that the mark is primarily geographically deceptively misdescriptive of the goods.

It is the examining attorney's burden to establish the prima facie case in support of the refusal of registration. A prima facie case for refusal under Section 2(e)(3) that the mark is primarily geographically deceptively misdescriptive of the goods requires a showing that (1) the mark's primary significance is a generally known geographic location; (2) the relevant public would be likely to believe that the goods originate in the place named in the mark (i.e., that a goods/place association exists) when in fact the goods do not come from that place; and (3) the

5

misrepresentation is a material factor in the consumer's decision.  See In re California Innovations Inc., supra at 1858; and In re South Park Cigar Inc., supra at 1509.

The examining attorney argues, based on entries from The Oxford Russian-English Dictionary (1972), that MOSKOVSKAYA is the adjectival form of the word "Moscow," in Russian, meaning "of or from Moscow."  The examining attorney essentially contends that under the doctrine of foreign equivalents, the ordinary American purchaser, which as stated in In re Thomas, 79 USPQ2d 1021, 1024 (TTAB 2006) refers to the "ordinary American purchaser who is knowledgeable in the foreign language,"[4] will translate the mark into its English equivalent.  Pointing to The American Heritage Dictionary of the English Language (Third Edition 1992) wherein Moscow is described as "The capital and largest city of Russia," with a population of 8,368,200,[5] the examining attorney argues that Moscow is a generally known location, and as the adjectival form of Moscow, the primary meaning of the mark as a whole is geographic.  In addition, the examining attorney submitted printouts from various websites which he contends show that

---

[4] The "ordinary American purchaser" is the "relevant public" for the goods involved in this case.

[5] The examining attorney identified the source for this entry but did not supply a copy of the entry.  Nevertheless, we have located this resource and we take judicial notice of its content.  See In re CyberFinancial.Net Inc., 65 USPQ2d 1789, 1791 n.3 (TTAB 2002) (the Board may take judicial notice of standard reference works, including online reference works which exist in printed format).

Moscow is known for its production of vodka. The examining attorney concludes that because Moscow is known for vodka, the misrepresentation of origin is material to the consumer's purchasing decision.

There is no dispute as to the meaning of MOSKOVSKAYA in English. Indeed, Ms. Sfondylia states in her declaration that "the geographic location named in the mark is Moscow, since MOSKOVSKAYA means 'of or from Moscow' in the Russian language." Nor is there any dispute that "Moscow," the root of MOSKOVSKAYA, is a generally known geographic location or that "Moscow" has no significance other than its geographic significance.[6] Furthermore, applicant specifically states that the vodka will not originate in Moscow.

Applicant argues, however, that the primary meaning of MOSKOVSKAYA is not geographic. Applicant contends, based on its interpretation of Palm Bay Import, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005), that the examining attorney has erroneously applied the doctrine of foreign equivalents in this case. In addition, applicant commissioned a survey which, in applicant's view, "demonstrates conclusively" that the doctrine does not

---

[6] Applicant's present attorneys specifically state that they do not subscribe to the position taken by applicant's former counsel in this case, namely that MOSKOVSKAYA is derived from the surname MOSKOVITZ. (Reply Brief, n. 3.)

apply.  (Brief, p. 24.)  The survey also shows, according to applicant, that none of the three elements necessary to show that a mark is primarily geographically deceptively misdescriptive exists in this case.  Applicant concludes that the meaning of the mark is arbitrary because the term would not be translated into English by consumers, and that its geographic meaning would be lost on the public.

We turn first to applicant's arguments regarding *Palm Bay* which, in applicant's view, compels a finding in this case that the doctrine of foreign equivalents does not apply.

Under the doctrine of foreign equivalents, foreign words from common, modern languages are translated into English to determine genericness and descriptiveness, as well as similarity of connotation in order to ascertain confusing similarity with English word marks.  See Palm Bay, supra.  Cf. Enrique Bernat F. S.A. v. Guadalajara Inc., 210 F.3d 439, 54 USPQ2d 1497, 1499 (5th Cir. 2000) ("courts need not concern themselves with words from obsolete, dead, or obscure languages").

Although the doctrine most often arises in cases involving likelihood of confusion and marks that are generic or merely descriptive, the doctrine also applies to issues concerning geographic marks.  See, e.g., In re Joint-Stock Co. "Baik", 80 USPQ2d 1305 (TTAB 2006) (BAIKALSKAYA, translated as "from

8

Serial No. 74382759

Baikal," is primarily geographically descriptive of vodka from Lake Baikal).

According to the test enunciated in *Palm Bay*, the doctrine should be applied "when it is likely that the ordinary American purchaser would 'stop and translate [the term] into its English equivalent.'" Palm Bay, supra at 1696, quoting In re Pan Tex Hotel Corp., 190 USPQ 109, 110 (TTAB 1976).[7] The "ordinary American purchaser" in this case refers to the ordinary American purchaser of vodka who is knowledgeable in Russian. As discussed more fully below, because the mark is in Russian, a common, modern foreign language, we must consider that an appreciable segment of the buying public will speak or understand this language, and we must therefore determine whether the mark is primarily geographically deceptively misdescriptive from the perspective of those consumers. See In re Thomas, supra at 1024 (the "ordinary American purchaser" in a case involving a foreign language mark refers to the ordinary American purchaser who is knowledgeable in the pertinent foreign language).

Applicant argues that the Board's decision in *Thomas* is inconsistent with the holding in *Palm Bay* "to the extent that the Board interpreted the Court's reference to the 'ordinary American

---

[7] In *Pan Tex*, the Board found it unlikely that purchasers "would stop and translate" LA POSADA into its English equivalent "the inn" and accordingly held that the mark was capable of distinguishing the source of applicant's lodging and restaurant services and entitled to register on the Supplemental Register.

9

purchaser' to mean 'the ordinary American purchaser who is knowledgeable in the foreign language,'" and that the *Thomas* case along with the authorities cited for this proposition "are no longer good law." (Brief, p. 23, n. 12.) Applicant contends that the Board's interpretation in *Thomas* "simply can not be squared" with the holding in *Palm Bay* which, according to applicant, found that "it was 'error' for the Board to have based its decision on the fact that 'an appreciable number of purchasers in the U. S. speak and/or understand French.'" In particular, applicant argues:

> The Court of Appeals was ... consistent [throughout the decision] in describing the relevant purchaser to whom its test should be applied as (1) 'an American buyer', (2) 'the ordinary American purchaser', and (3) 'the average American purchaser' -- characterizations that all have the same essential meaning. Nowhere in the *Palm Bay* decision is there any suggestion that the relevant purchaser is, as the Board held in *Thomas,* 'the ordinary American purchaser who is knowledgeable in the foreign language.' To the contrary, the court of Appeals specifically <u>rejected</u> as 'error' the Board's attempt to so define the relevant purchaser in Palm Bay... (Reply Brief, p. 10, emphasis in original.)

We disagree with applicant's interpretation of the *Palm Bay* case. Applicant has improperly taken the Court's references to the "ordinary American purchaser" out of context and has missed the import of the decision. In the Board decision reviewed by the Federal Circuit, the Board had determined that Palm Bay's mark VEUVE ROYALE for sparkling wine was confusingly similar to

10

VCP's marks VEUVE CLICQUOT PONSARDIN, VEUVE CLICQUOT and THE WIDOW for champagne. Applicant points to the following language by the Court referring to the error in the Board's decision:

> The Board held that Palm Bay's VEUVE ROYALE was confusingly similar to VCP's mark THE WIDOW, in part because under the doctrine of foreign equivalents, an appreciable number of purchasers in the U.S. speak and/or understand French, and they "will translate" applicant's mark into English as "Royal Widow." *Veuve Clicquot Ponsardin*, slip op. at 36. The Board erred in so finding.

However, after stating that the Board erred in its finding as to the marks VEUVE ROYALE and THE WIDOW, the Court went on to explain why the Board finding was in error. The Court noted that the Board, in comparing VEUVE ROYALE with VEUVE CLICQUOT PONSARDIN and VEUVE CLICQUOT, "found that 'an appreciable number of purchasers are unlikely to be aware that VEUVE means 'widow' and are *unlikely to translate* the marks into English,'" but at the same time the Board found, in comparing VEUVE ROYALE with THE WIDOW that "'[A]n appreciable number of purchasers in the United States speak and/or understand French, and they *will translate* applicant's mark into English as ROYAL WIDOW.'" (Emphasis in original.) Because the Board found that an appreciable number of U.S. consumers "either will or will not translate VEUVE into 'widow'" the Court stated that the Board "was inconsistent in its application of the doctrine of foreign equivalents."

Contrary to applicant's contention, the Court did <u>not</u> hold

that it was "error" for the Board to have based its decision on the fact that "an appreciable number of purchasers in the U.S. speak and/or understand French," or that the Board erred in defining this "appreciable number of purchasers" as the relevant group for analysis under the doctrine of foreign equivalents. Rather, the Board's error was in finding that such purchasers "will translate" applicant's VEUVE ROYALE mark into English.[8]  In view of the Board's own finding, on the one hand, that purchasers would be "unlikely to translate" applicant's VEUVE ROYALE mark and two of opposer's three marks, and its contradictory finding, when comparing applicant's mark with opposer's third mark (THE WIDOW), that purchasers would translate applicant's mark, the Court merely decided which of the contradictory findings was correct and which was in error.  Thus, when the Court agreed with the Board that the average American purchaser was unlikely to translate the VEUVE ROYALE mark and disagreed with the Board's contradictory finding, it did not address the definition of the "ordinary American purchaser."

---

[8] This view of *Palm Bay* is supported by Sutter Home Winery, Inc. v. Madrona Vineyards, L.P., 2005 WL 701599 (N.D. Cal. 2005) (unpublished). The Court observed that reliance on the doctrine of foreign equivalents "is merely an application of the general rule that two marks are confusingly similar only when their use 'would cause confusion of any appreciable number of ordinary prudent purchasers as to source of the goods' [citation omitted]."  Continuing, the Court noted, citing *Palm Bay* ("396 F.3d at 1377"), that this inquiry "in turn depends on whether an 'appreciable number of purchasers in the United States,' who courts presume to speak English as well as the pertinent foreign language, will understand the meaning of the foreign word mark at issue and translate that mark into its English equivalent."

Furthermore, the Court at no point said, or even suggested, that in determining the registrability of a mark in a foreign language, the "ordinary American purchaser" who speaks or understands the foreign language can, in effect, be ignored. Applicant argues that the *Thomas* decision "cannot be squared" with the Court's holding in *Palm Bay*. The fact is, however, that applicant's position "cannot be squared" with the underlying principles of the Trademark Act.

The purpose of the Trademark Act is two-fold: to protect business and to protect the consumer. See Nitro Leisure Products L.L.C. v. Acushnet Co., 341 F.3d 1356, 67 USPQ2d 1814, 1818 (Fed. Cir. 2003) ("In passing the Lanham Act, Congress noted that the purpose was 'to protect legitimate business and consumers of the country.'" [Citation omitted]); and In re Owens-Corning Fiberglas Corporation, 774 F.2d 1116, 227 USPQ 417, 418 (Fed. Cir. 1985). The doctrine of foreign equivalents is fundamental to this protection. It extends the protection of the Act to those consumers in this country who speak other languages in addition to English. As explained in Otokoyama Co. v. Wine of Japan Import Inc., 175 F.3d 266, 50 USPQ2d 1626, 1629 (2d Cir. 1999), "This extension rests on the assumption that there are (or someday will be) customers in the United States who speak that foreign language." The Court noted "the diversity of the population of the United States, coupled with temporary visitors,

all of whom are part of the United States marketplace."  All U.S.
consumers, including those consumers who speak or understand both
English and a foreign language, are entitled to be protected
under Section 2(e)(3) from being deceived as to the geographic
source of a product.

Thus, to adopt applicant's position would undermine the
principle on which the doctrine of foreign equivalents is based
and the interests the doctrine is designed to protect.  In the
context of Section 2(e)(3), it would permit or even encourage
registration of foreign terms which have the potential to deceive
an appreciable segment of the relevant consumers in the United
States.

In addition, applicant's interpretation of *Palm Bay*
conflicts with long established case law involving the doctrine
of foreign equivalents which has consistently focused on the
relevant consumer who speaks or understands the foreign language.
Indeed, the Court of Customs and Patent Appeals (a predecessor to
the Federal Circuit), the Fourth Circuit and the Board, have
rejected the type of argument applicant is making here.[9]  See

---

[9] To the extent that applicant argued at the oral hearing that only a
certain type or category of foreign words or phrases would be
translated, such as those terms that are familiar to even those
Americans who do not speak or understand the foreign language,
applicant is mistaken.  It may be true in some cases that foreign words
or phrases are so familiar to the American public that they would not
even require translation or, therefore, application of the doctrine of
foreign equivalents.  See Bourjois, Inc. v. Parfums Schiaparelli, Inc.,
72 USPQ 32, 33 (Com'r Pats. 1946) ("knowledge of any foreign tongue" is

Nestle's Milk Products, Inc. v. Baker Importing Company, Inc., 86 USPQ 80, 82 (CCPA 1950) ("Foreign language words, not adopted into the English language, which are descriptive of a product, are so considered in registration proceedings despite the fact that the words may be meaningless to the public generally."); In re Northern Paper Mills, 64 F.2d 998, 17 USPQ 492, 493 (CCPA 1933) (GASA, Spanish for gauze, is merely descriptive of toilet paper; rejecting applicant's argument that the foreign word is not "necessarily descriptive in this country, where the English language is the language of the people."); Pizzeria Uno Corporation v. Temple, 747 F.2d 1522, 224 USPQ 185, 191 (4th Cir. 1984) ("Under this doctrine, 'foreign words are translated into English and then tested for descriptiveness or genericness,' 'by seeing whether that foreign word would be descriptive [of the product] to that segment of the purchasing public which is familiar with that language,' McCarthy, *Trademarks and Unfair Competition*, § 11.14, p. 464-65 (2d ed. 1984 Lawyers Coop."); Enrique Bernat, supra, 54 USPQ2d at 1500 ("explanation for denying trademark protection to generic foreign words is that Spanish-speakers in the U.S. will understand 'chupa' to be generic [for lollipop]"); Joint-Stock Co. "Baik," supra, 80

not essential in the case of marks such as "Si.Si..Si..." and "Mai Oui" which are words that "have been so widely popularized that they are virtually a part of our language."). At the same time, however, the law is clear that merely because the terms would not be familiar to those Americans who do not speak the foreign language is not a reason, in itself, to disregard the doctrine.

USPQ2d at 1310 ("There is no question that Russian speakers living in the United States, according to the record approximately 706,000 in number, would immediately know that BAIKALSKAYA means 'from Baikal.'"); In re Oriental Daily News, Inc., 230 USPQ 637, 638 (TTAB 1986) (refusing registration of a Chinese-language mark on the ground that a sizable number of American consumers who are familiar with both the Chinese and English languages would be likely to perceive the mark as merely descriptive); In re Optica International, 196 USPQ 775, 777 (TTAB 1977) ("It is a well established principle of trademark law in this country that the foreign equivalent of a merely descriptive English word is no more registrable than the English word itself despite the fact that the foreign term may not be commonly known to the general public"); and In re ZAZZARA, 156 USPQ 348, 348 (TTAB 1967) (PIZZE FRITTE, Italian for "fried buns," "would be recognized as such by that segment of the purchasing public which is familiar with the Italian language.").

Furthermore, as a general matter, it is never necessary to show that all, or even most, of the relevant consumers would be deceived. All that is required is a showing that some portion of relevant consumers will be deceived.[10] See, e.g., Singer

---

[10] Applicant relies on ConAgra Inc. v. Saavedra, 4 USPQ2d 1245, 1249 (TTAB 1987) wherein the Board states, "While respondent may presently market its meatless hot sauce [under the mark TAPATIO] to Spanish-speaking consumers in this country, there is nothing in the recitation of goods limiting the sale of the product to such a narrow class of

Manufacturing Co. *v.* Birginal-Bigsley Corp., 319 F.2d 273, 138 USPQ 63, 65 (CCPA 1963) (AMERICAN BEAUTY for sewing machines of Japanese manufacturer geographically deceptively misdescriptive to that segment of the American public that prefers sewing machines of American manufacture to Japanese machines; "That segment is entitled to buy according to its prejudices and preferences without the danger of being deceived or confused by geographically misdescriptive marks. We suppose that recognition of that right is the reason for section 2(e)(2)."). See also, e.g., Mushroom Makers, Incorporated v. R.G. Barry Corporation, 580 F.2d 44, 199 USPQ 65, 66 (2d Cir. 1978) (the issue is whether "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be...confused, as to the source of the goods in question"); and United States ex rel. Federal Bureau of Investigation v. Societe Anonyme Francaise M. Bril and Co., 187 USPQ 685, 687 (D.D.C. 1975) (the relevant standard under Section 2(d) is whether it is likely that "a sizeable number of normally intelligent persons exercising due care, would be confused.")

The standard is the same when the mark involves a foreign language term. That is, in determining whether a mark in a

---

consumer." However, the decision in that case was based at least in part on the fact that there was no evidence "that even a significant portion of the Spanish-speaking consuming public recognizes 'tapatio' as a primarily geographical designation."

foreign language is deceptive as to geographic origin, the question is whether an appreciable number of consumers for the goods or services at issue will be deceived.  At least one significant group of "ordinary American purchasers" is the purchaser who is knowledgeable in English as well as the pertinent foreign language.

With the above principles in mind, we presume that a word in one of the common, modern languages of the world will be spoken or understood by an appreciable number of U.S. consumers for the product or service at issue.  See In re Northern Paper Mills, supra, 17 USPQ at 493 ("a descriptive word, used in one of the modern languages of the principal nations of the world cannot be properly registered as a trade mark [in the United States].").

As for the present case, there is no question that Russian is a common, modern language.  Indeed, according to the U.S. Census 2000, the Russian language is spoken by 706,000 people in the United States.[11]  See also Joint-Stock Co. "Baik," supra.  The question is whether those who understand the language "will stop and translate the word into its English equivalent." *Palm Bay*, supra at 1696.  This question in turn necessarily depends upon

---

[11] We take judicial notice of this information obtained from the United States Census Bureau, Census 2000 (www.census.gov).  See U.S. v. Bailey, 97 F.3d 982, 985 (7th Cir. 1996) (judicial notice taken of facts from Census Bureau's Statistical Abstract of the United States); Knox v. Butler, 884 F.2d 849, 852 n. 7 (5th Cir. 1989) (judicial notice appropriately taken of census data); and Citizens Financial Group Inc. v. Citizens National Bank of Evans City, 383 F.3d 110, 72 USPQ2d 1389 (3d Cir. 2004).

the particular facts and circumstances of the case.  While there are exceptions to the rule, and circumstances where translation is unlikely, none of those circumstances exist here.

The term MOSKOVSKAYA and its translation, "of or from Moscow," are essentially equivalent in meaning.  Compare, e.g., In re Sarkli, Ltd., 721 F.2d 353, 220 USPQ 111, 112 (Fed. Cir. 1983) ("None of these [dictionary] definitions makes 'second chance' the exact translation of [the French word] 'repechage.'"); and In re Pan Tex Hotel Corporation, 190 USPQ 109 (TTAB 1976) (finding that while LA POSADA may be literally translated as "the inn," the various dictionary definitions showing that the term "carries the added implication of a home or dwelling" made it clear that the designation had a "connotative flavor" which was slightly different from that of the words "the inn").  Compare also Pizzeria Uno, supra, 224 USPQ at 192 (PIZZERIA UNO is not descriptive of restaurant services as "the term 'Uno' is not to be translated as equivalent to our colloquial term 'Number One' in the sense of the 'best'; but the translation is merely 'one,' no more and no less.").

There is nothing in the record to indicate the mark would not be translated because of marketplace circumstances or the commercial setting in which the mark is used.  Compare In re Pan Tex Hotel Corporation, supra (finding that because of the setting in which applicant uses LA POSADA, that is, on a sign mounted in

front of its motor hotel where the words "motor hotel" appear directly under the notation LA POSADA, it is unlikely that purchasers would stop and translate LA POSADA into its equivalent "the inn"); and In re Tia Maria, Inc., 188 USPQ 524 (TTAB 1984) (finding it unlikely that a person who had purchased AUNT MARY'S canned fruits and vegetables from a supermarket would, upon dining at the TIA MARIA restaurant surrounded by Mexican décor and serving Mexican food, translate TIA MARIA into AUNT MARY and then mistakenly assume that both goods and services originated from the same source.)

There is also no question that the translated meaning of MOSKOVSKAYA is not obscure. Cf., e.g., In re Isabella Fiore LLC, 75 USPQ2d 1564 (TTAB 2005) citing In re Advanced Spine Fixation Systems, Inc., 25 USPQ2d 1367, 1369 (TTAB 1992) ("Many surnames of foreign origin have obscure meanings which lose out to the primary surname significance.").

Thus, applying the doctrine of foreign equivalents in this case, we find that the primary meaning of MOSKOVSKAYA, meaning "of or from Moscow," is geographic. The common, adjectival form of the term does not detract from the geographic meaning of the mark as a whole. See In re Joint-Stock Co. "Baik," supra (BAIKALSKAYA, meaning "from Baikal" in English, is primarily geographically descriptive of vodka from that area); and In re Jacks Hi-Grade Foods, Inc., 226 USPQ 1028 (TTAB 1985) (NEAPOLITAN

held primarily geographically deceptively misdescriptive as applied to sausage emanating from the United States). Indeed, the adjectival meaning, "from Moscow" actually emphasizes the geographical significance.

In addition, as shown by the website evidence submitted by the examining attorney, Moscow is known for the production of vodka.[12] For example:

> If you want to drink vodka as it was meant to be drunk you have to head for Moscow - the capital of vodka production in the country, where most native brands such as Stolichnaya and Smirnoff are made. "This is Travel" website.

> It is quite symbolic that the museum is now situated in Moscow, which is the historical place this famous drink originates from, 15th century being the starting point of its history.
> ...
> It is not surprising then that in 1953 the "Moscow Special" was awarded a gold medal at an international exhibition in Switzerland. ...
> ...
> "The Vodka Museum" website

We also take judicial notice of an entry from the Encyclopædia Britannica (2007) describing Moscow as follows:[13]

---

[12] The website addresses do not appear on the excerpt printouts; nor did the examining attorney provide this information. However, because applicant has not objected to the authenticity of this evidence we have considered it properly of record.

[13] From the Encyclopædia Britannica Online at www.eb.com. Applicant attempts to discredit the information on the "This is Travel" website above arguing that the statement that Moscow is "where most brands such as Stolichnaya and Smirnoff are made" is "flatly incorrect"; that applicant "can attest to the fact that [Stolichnaya] is made in Kaliningrad, not Moscow"; and that "as plainly stated on the [Smirnoff] label," the vodka is "produced in the USA" by a U.S. company. (Brief,

> ... [Moscow's] most important products include
> processed meat and dairy items, confectionery, and
> alcoholic beverages.  Among the city's most
> successful firms is the Kristall Distillery, which
> produces the renowned Stolichnaya vodka.

We find that the evidence is sufficient to show, prima facie, that there is a goods/place association of Moscow with vodka, and moreover that Moscow is noted for vodka production, or that alcoholic beverages, which would include vodka, are principal products of Moscow.  Thus, we may infer, in view of the strong connection between vodka and Moscow, that purchasers are likely to be deceived into believing that applicant's vodka will come from Moscow when in fact it will not.  See In re House of Windsor, Incorporated, 221 USPQ 53, 57 (TTAB 1983) ("if the record contains a reliable gazetteer entry (or the like) to the effect that applicant's goods (or sufficiently related goods) are a principal product of the geographical area named by the mark, such evidence is sufficient to establish the materiality of the deception").  See also *California Innovations*, supra, citing pre-NAFTA cases meeting the "new NAFTA standards" for materiality such as In re Loew's Theatres, Inc., 769 F.2d 764, 226 USPQ 865,

---

p. 21, n. 10.)  However, applicant has not "attested" to these facts, as it claims; nor has applicant otherwise supported them.  Moreover, the encyclopedic reference specifically states that Stolichnaya vodka is (or at least was at the time of publication of this entry) produced in Moscow, and the evidence as a whole shows that vodka, in general, if not a particular brand of vodka, is a principal product of Moscow. Finally, whether or not the statements in the websites or the encyclopedia as to the origins of specific brands are true, they show that the authors associate Moscow and vodka.

868 n.6 (Fed. Cir. 1985), wherein the Court explained "if the place is noted for the particular goods, a mark for such goods which do not originate there is likely to be deceptive under §2(a) and not registrable under any circumstances."); and In re South Park Cigar Inc., supra at 1516 (TTAB 2007) (a showing that the goods are "a principal product" of the place named in the mark, that the place is "noted for" the goods, or that the goods are, or are related to, the "traditional" products of the place named in the mark supports a finding of materiality).

We turn next to applicant's survey which, according to applicant, establishes that MOSKOVSKAYA would not be translated into English by consumers, and also that none of the elements of the Section 2(e)(3) test exists.

This was a mall intercept survey designed by Dr. Jerry (Yoram) Wind, president of Wind Associates, Inc. and a professor of marketing at the Wharton School of the University of Pennsylvania. The survey was conducted at shopping malls located in 12 markets (3 in each of the four census regions) by Guideline Research of New York under Dr. Wind's direction. Dr. Wind prepared a report describing the survey and discussing the results. The verbatim responses were recorded and included with the report.

The stated objective of the survey was to show whether:

Serial No. 74382759

       (1) the consuming public is likely to believe the place allegedly identified by the mark (Moscow) indicates the origin of goods bearing the mark, when in fact the goods do not come from that place, and

       (2) the alleged misrepresentation is a material factor in the consumer's decision.

The universe for the survey, as defined by Dr. Wind, consisted of U.S. consumers at least 21 years of age and over "who have bought vodka in the past year or who would consider buying vodka in the next 3 months either in a store or bar/restaurant and who make the buying decision."  (Report, p. 3.)

The sample for the survey consisted of a total of 454 respondents, 231 of whom were placed in the test group and 223 in the control group.  Respondents in the test group were shown a card with the name MOSKOVSKAYA and those in the control group were shown the fictitious name VOSKOVSKAYA.  The two groups were asked the following questions:

1.  Do you have any idea where this vodka is made?

    Yes__  No__  DK__

2. (a) (if yes) Where do you think this vodka is made?
   (b) And what makes you think so?

3. (a) Assuming you were considering buying a bottle of this vodka or ordering a drink made with it, would your decision be affected or not be affected if we told you that it is made in a Russian city named Kaliningrad?

    Yes__  No__ DK__

   (b) (If yes) Why?

(c) (If yes)  If we told you that it is made in a Russian city named Kaliningrad would you be:

    (1) More likely to buy it?
    (2) Less likely to buy it?
    (3) Neither?
    (4) Or don't you know?

As indicated in Dr. Wind's report, of the 231 respondents in the test group, 137 respondents (59.3%) answered "Russia" in response to question 2(a),[14] and 6 respondents (2.6%) answered "Moscow" in response to that question.  Of the 137 respondents who gave the answer "Russia" in response to 2(a), 18 respondents (7.8%) answered "Moscow" (or some variation of that name such as Mosko, Mosco, Moscov) in response to question 2(b) as a reason for their belief that the vodka is made in Russia.[15]  Nineteen of the 24 respondents who answered "Moscow" in response to either 2(a) or 2(b), answered in response to question 3(a) that their decision to buy the vodka would not be affected if they were told it was made in the Russian city of Kaliningrad; and none of these 24 respondents said in response to question 3(c) that they would be less likely to purchase the vodka if they were told it is made in the Russian city of Kaliningrad.

---

[14] The report shows that 54.7% of those in the control group answered "Russia" in response to question 2(a).  Dr. Wind found no significant difference between those mentioning Russia in the test group in response to 2(a) and those mentioning Russia in response to the fictional control name.  (Report, p. 10 n*[sic]).

[15] Only one respondent in the control group answered "Moscow" to question 2(a) and no one in that group gave the answer "Moscow" in response to 2(b).

Dr. Wind concluded from these results that "1. ... The consuming public thus is not likely to believe that the place allegedly identified by the MOSKOVSKAYA mark (Moscow) is the origin of the vodka bearing that mark"; and further that "2. ... The fact that MOSKOVSKAYA vodka is not made in Moscow is not a material factor in consumers' decision whether to buy the vodka."[16]   (Report, pp. 19-20.)

We have a number of problems with the survey and report. The critical problem is the universe selected by Dr. Wind.  As discussed above, consumers who are knowledgeable in the Russian language are deemed to constitute an appreciable segment of the buying public.  However, Dr. Wind did not screen for these consumers.  There is no way of knowing whether the views of this significant subset of potential purchasers was properly represented in the survey because Dr. Wind made no effort to include them.  Under the circumstances, the survey results cannot

_____

[16] Dr. Wind states in his conclusions that "A statistical analysis of the data on which the above conclusions (1 and 2) are based shows that the difference between the test group...and the control group...are not statistically significant."  (Report, p. 20.)  He also states that "the overlap between the 95% confidence intervals of the two groups is very large" (Appendix H, "Statistical Analysis") and that "Given that the control stimulus was a fictitious name, the statistical results further strengthen our confidence in the [above conclusions]."  Presumably, Dr. Wind is taking the position that the 2.6% figure (those who answered "Moscow" in response to question 2(a)) is not statistically significant.  However, from our review of Appendix H of the report, Dr. Wind made no such finding with respect to the 7.8% figure (those 18 who answered "Moscow" in response to question 2(b)).  In fact, Dr. Wind makes no separate findings as to this figure with respect to question 2(b), or as to its significance in relation to the control group.

be considered meaningful or probative.  See McCarthy on Trademarks and Unfair Competition §32:159 (4th ed. 2007) ("A survey of the wrong 'universe' will be of little probative value in litigation  [citations omitted].").

Notwithstanding this deficiency in the survey universe, and reviewing the survey on the assumption that the universe was proper, we still find that the survey is not persuasive or probative of any issue in this case.

First, as we mentioned earlier, applicant, although acknowledging that the objective of the survey "was to determine whether conditions two and three of the *California Innovations* test are met as to the MOSKOVSKAYA mark" (Brief, p. 12), at the same time insists that the results also "demonstrate conclusively" that the doctrine of foreign equivalents does not apply.  (Brief, pp. 19, 24).  However, the survey did not even test for whether the mark would be translated.  The question asked by the survey was where respondents think MOSKOVSKAYA vodka is made, not what they think MOSKOVSKAYA means.  Those are two very different concepts.  We also note that Dr. Wind drew no such conclusion from the survey, and the results do not support such finding.

Second, the survey does not serve to rebut the examining attorney's prima facie case.  To begin with, we disagree with Dr. Wind's assessment of the results.  We note applicant's argument

that only 6 of the 231 respondents (2.6%) believe that

MOSKOVSKAYA vodka is made in Moscow, and that this level of

confusion as to the geographic origin of MOSKOVSKAYA vodka "is

far lower than the 25 - 50 percent survey percentages courts have

found sufficient to support a likelihood of confusion."[17]  (Brief,

p. 17.)  Apart from the question of whether it is appropriate to

rely on the likelihood of confusion figures for a survey on

geographic deceptiveness, in our view, Dr. Wind improperly

calculated the results.  For one thing, we believe it is

appropriate to combine the 6 respondents who answered "Moscow" in

response to 2(a) with the 18 (7.8%) who answered "Moscow" (or a

variant) in response to 2(b), raising the percentage to 10.4%.

It is clear that in both cases the respondents are identifying

the mark with "Moscow."  This figure is not insignificant

considering the universe selected for the survey and the fact

that those who recognized the term as "Moscow" may not have even

been familiar with the Russian language.  We also see, in

reviewing the verbatim answers, that Dr. Wind counted a

significant number of what we consider to be ambiguous responses

---

[17] As support for this argument, applicant cites McCarthy on Trademarks
and Unfair Competition, supra at § 32:188 ("Generally, figures in the
range of 25 percent to 50 percent have been viewed as solid support for
a finding of a likelihood of confusion.").  However, that section also
goes on to note that the percentage can vary from case to case and that
results showing confusion levels as low as 11% and even 8% have been
considered significant.

as among the favorable responses, unfairly skewing the results towards applicant.[18]

But even if we accept Dr. Wind's figures at face value, the results are not significant. A mall intercept survey, while clearly admissible and a recognized survey method, is entitled to limited probative weight because it is not based on a random sample and the results cannot be projected to the entire universe of relevant purchasers. See Frank Brunckhorst Co. v. G. Heileman Brewing Co., 875 F.Supp. 966, 35 USPQ2d 1102 (E.D.N.Y. 1994) (a random or probability sampling is entitled to more weight than a face-to-face mall intercept, which is not random); Calvin Klein Co. v. Farah Manufacturing Co., (not reported in F.Supp.), 229 USPQ 795 (S.D.N.Y. 1985) (intercept survey is less accurate than a probability sampling survey because the results cannot be statistically projected to the entire nationwide population); and R. J. Reynolds Tobacco Co. v. Loew's Theatres, Inc., 511 F. Supp. 867, 210 USPQ 291, 297 (S.D.N.Y. 1980) (mall intercept study

---

[18] While it is clear that a number of respondents answered "Russia," in response to 2(a), perhaps even without any understanding of the meaning of the mark as referring to Moscow (e.g., "There are a lot of syllables" (1011); "Because you can hardly pronounce it" (1070)), at least 20 other respondents gave answers that can only be characterized as ambiguous. Those answers include "Because of the name," (given by a number of respondents, including 1034, 1045, 1069, 1107); "The first six letters" (1137); and "First two syllables are mos kov" (1232). It cannot be determined what it is about the name or the spelling of MOSKOVSKAYA that caused the respondents to believe the vodka is made in Russia. For example, one respondent answered "Moscow" in response to 2(a) because "it's in the name of the vodka" (1003). It is possible that those who answered "because of the name," or the like, were thinking of the name "Moscow."

"fails to produce a nationally projectable statistical percentage."). Thus, we cannot infer that the views allegedly reflected in this survey represent the views of the relevant public at large.[19]

On the other hand, the results of a mall intercept survey can tell us about the opinions of those participating in the survey. However, where as here, the number of participants is rather small (231), the survey provides limited information about consumer views, and the resulting 2.6% percentage value (even assuming that figure is correct), is not particularly meaningful. To use an extreme example, in a survey showing that 1 out of a total of 4 participants is deceived, the resulting deception rate of 25%, while impressive on its face, is in fact virtually meaningless data considering the size of the sample.

More important, the survey did not adequately test for any of the elements of the Section 2(e)(3) test. We note that Dr. Wind does not explain in his report why the particular questions were selected, and we believe the questions are improperly or insufficiently focused. We also find that at least some of the

---

[19] We also note that the report does not indicate the number of participants from each mall, and the number of actual interviews could have been primarily from one mall or from a single geographic region, further impacting the results. See, e.g., Exxon Corp. v. Xoil Energy Resources, Inc., 552 F.Supp. 1008, 216 USPQ 634, 646 (S.D. N.Y. 1981) ("Nor can it seriously be contended that a survey predicated upon interviews with 194 persons chosen as the interviewees here were chosen will support projection over a broad geographical base, or conclusions predicated thereon").

questions were not designed to obtain unbiased results. To begin with, question 2(a) ("Do you have any idea where this vodka is made?") would not necessarily elicit the response "Moscow" even if the respondents thought the mark meant Moscow or that the vodka came from Moscow. In fact, in response to that question, 137 respondents (59.3%) correctly answered that the vodka was made in Russia. The follow-up question in 2(b) ("What makes you think so?") does not really clarify matters because, again, it would not necessarily elicit "Moscow" even if the respondents were thinking "Moscow." Once the respondents answered "Russia" in response to 2(a), that answer could very well have set the context for their answer to question 2(b). The respondents may have thought the question was asking why they think the vodka comes from Russia. This can be seen from some of the verbatim responses to that question, for example, "Russians are known for making good vodka" (1099); "That is what people associate vodka with" (1102); and "Best vodkas in the world are made out of Russia (1228)." The question should have in some way probed for a more specific location.

Question 3, which purports to test for materiality, was not actually designed to reveal this information.[20] In particular,

---

[20] For purposes of the examining attorney's prima facie case, materiality is presumed from the evidence showing that Moscow is known for vodka. However, in order to rebut the prima facie case, it is applicant's burden to establish that the presumption of materiality is not, in fact, valid. In order to show that the public is not deceived

Question 3(a) ("Assuming you were considering buying a bottle of this vodka or ordering a drink made with it, would your decision be affected or not be affected if we told you that it is made in a Russian city named Kaliningrad") is a loaded question. The country of Russia is widely known for vodka production. Further, applicant itself points out that Kaliningrad was identified by the Board in the Joint-Stock Co. "Baik" case (at 1311) as "among the main exporters" of Russian vodka. So respondents were essentially apprised by question 3(a) that the vodka actually comes from a city known for vodka, within a country known for vodka. It is not surprising, then, that most of the respondents who answered "Moscow," in response to question 2(a) or 2(b), also answered that their decision would not be affected if they were told the vodka comes from this other city in Russia. It might have been more useful to ask respondents whether their decision would be affected if they were told the vodka came from, for example, Dover, Delaware, or at least some geographic place that is not known, or so obviously known, for vodka. In fact, we do

---

by a false geographic term for vodka, it is necessary to show that the geographic origin of the vodka is not "material" to their purchasing decision. For this factor to be material to a consumer, the consumer first has to care about the geographic source of the vodka. If purchasers of vodka do not care about where the vodka comes from to begin with - for example, their purchasing decision is based on the price of the vodka or their preference for a particular brand, or some other factor which may have nothing to do with geographic origin - they cannot possibly be deceived by the false geographic term. Therefore, the survey should have ascertained, rather than assumed, that the geographic source of vodka is an important consideration to purchasers of vodka.

not understand why respondents were not simply asked whether knowing that the vodka came from Moscow would affect their decision to purchase the vodka.  As it stands, question 3(a) virtually guarantees a favorable response to question 3(c), i.e., that respondents would not be less likely to purchase the vodka if they were told it is made in the Russian city of Kaliningrad.

**Decision:**  In view of the foregoing, we find that the evidence shows prima facie the mark MOSKOVSKAYA is primarily geographically deceptively misdescriptive as applied to vodka, and that applicant's evidence and arguments fail to rebut this prima facie showing.

The refusal to register under Section 2(e)(3) is affirmed.