**INTEL CORPORATION,**
**Plaintiff–Appellee,**

v.

**TERABYTE INTERNATIONAL, INC., Jean Hsu, Kenneth Hsu,**
**Defendants–Appellants.**

**Nos. 92–55207, 92–55424.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 2, 1993.

Decided Sept. 27, 1993.

**616**

Harlan P. Huebner and R. Joseph Trojan, Trojan Law Offices, Los Angeles, CA, for defendants-appellants.

Rebecca A. Lenaburg, Katherine J. Poss and Nora Cregan, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for plaintiff-appellee.

Before NOONAN, FERNANDEZ, and KLEINFELD, Circuit Judges.

FERNANDEZ, Circuit Judge:

Terabyte International, Inc., Jean Hsu and Kenneth Hsu (collectively referred to as "Terabyte") appeal the district court's judgment following a bench trial in Intel Corporation's ("Intel") trademark infringement action under the Lanham Act, 15 U.S.C. §§ 1051–1127 and California state law. Terabyte contends that the district court erred by concluding that it had misappropriated Intel's trademark and that it acted willfully. Terabyte also challenges the district court's award of damages and attorney's fees. We affirm on the merits, but reverse and remand as to the amount of attorney's fees.

## STATEMENT OF FACTS

Intel manufactures micro computer components and systems, including devices known as math coprocessors. Intel produces several different math coprocessors that offer varying levels of performance, which affect the speed at which personal computers function. For example, the Intel 287–6 is designed for computers operating at six megahertz, whereas the 287–10 chip has the capacity to run at ten megahertz. "Slower" or low performance math coprocessors are less expensive than "faster" or high performance math coprocessors. Intel distributes its math coprocessors directly to original equipment manufacturers and through authorized retail distributors.

Terabyte is a computer components broker which sells Intel math coprocessors to end users. Terabyte did not purchase math coprocessors directly from Intel; rather it obtained the devices from other brokers and distributors. This action involves the distribution and sale of falsely designated 287–10 and 387–25 Intel math coprocessors.

After receiving complaints from its authorized distributors that math coprocessors were available at prices below cost, Intel launched an investigation. It discovered that slower math coprocessors were being redesignated and sold as faster and more expensive math coprocessors.[1] Intel tracked some of those "remarked" math coprocessors to Terabyte. Between July, 1990 and January, 1991, Intel, acting as an undercover customer, purchased math coprocessors from Terabyte, the great majority of which were remarked. On some of those math coprocessors, the original Intel markings could be detected beneath the remarkings. Each time Intel bought math coprocessors from Terabyte, the box containing the product was already opened. Based on those purchases, Intel sought and obtained an ex parte seizure order against Terabyte. The order was executed on February 26, 1991. One hundred twenty five math coprocessors were seized; all were remarked.

At trial, Terabyte introduced evidence in an attempt to show that its actions were innocent. Terabyte stated that it had bought math coprocessors from Microstar and had

---

1. Intel labels its math coprocessors by laser etching the particular model number, e.g. 287–6, on the chip itself. Intel found that those markings were either physically removed or covered and replaced with different markings bearing the Intel logo.

attempted to sell those math coprocessors to Telecomputer. Telecomputer rejected the math coprocessors because they were re-marked products. Telecomputer showed Terabyte how to detect the original markings on the math coprocessors. After receiving remarked math coprocessors from Microstar on more than one occasion, Terabyte alleged-ly complained to Microstar. Microstar re-ferred Terabyte to its supplier, Fred Worthy, and Terabyte began buying math coproces-sors from Worthy after obtaining reassuranc-es from Worthy and a person whom Worthy called on his speaker phone, who was said to be from Intel, that Worthy was an authorized Intel distributor. As it turns out, Worthy bought only 287–6 math coprocessors from Intel and sold remarked 287–10 math copro-cessors to Terabyte.

After a three-day bench trial, the district court found Terabyte liable for trademark infringement and awarded $380,663.00 in damages. The district court also found that the infringement was willful and awarded attorney's fees in an amount to be deter-mined at a later time. On June 9, 1992, the district court ordered Terabyte to pay Intel's attorney's fees in the amount of $206,410.25.

## JURISDICTION AND STANDARD OF REVIEW

### A. General

Intel brought this action under the Lan-ham Act and California state law. The dis-trict court had jurisdiction over the Lanham Act claims pursuant to 15 U.S.C. § 1121, and we have jurisdiction over the final judgment under 28 U.S.C. § 1291.

"In reviewing the factual findings of the District Court, the Court of Appeals [is] bound by the 'clearly erroneous' standard of Rule 52(a), Federal Rules of Civil Proce-dure." *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). "An appellate court can-not substitute its interpretation of the evi-dence for that of the trial court simply be-cause the reviewing court might give the facts another construction, [and] resolve the ambiguities differently...." *Id.* at 857, 102 S.Ct. at 2190 (quotation omitted).

### B. Attorney's Fee Award

Intel argues that we lack jurisdiction to review both the district court's decision to award Intel's attorney's fees and the amount of the award because Terabyte did not ap-peal from the district court's order determin-ing the amount of fees. Terabyte answers that we have jurisdiction because the opening brief was filed within 30 days of the final order setting the amount of attorney's fees and that document served as an adequate notice of appeal.

"A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 199, 108 S.Ct. 1717, 1720, 100 L.Ed.2d 178 (1988) (quotation omitted). "[A] claim for attorney's fees is not part of the merits of the action to which the fees pertain." *Id.* at 200, 108 S.Ct. at 1721. Thus, "an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final." *Id.* at 202, 108 S.Ct. at 1722; *see Internation-al Ass'n of Bridge, Structural, Ornamental, & Reinforcing Ironworkers' Local Union 75 v. Madison Indus., Inc.,* 733 F.2d 656, 659 (9th Cir.1984).

■ Because the issue of attorney's fees and determination of the merits are collateral to one another, it follows logically that an award of attorney's fees does not become final and appealable until the amount of the fee award is determined. Therefore, Tera-byte's notice of appeal, timely filed after the district court's corrected judgment but be-fore the determination of the fee amount, pertained only to the *merits* of the litigation. *Cf. Budinich,* 486 U.S. at 202, 108 S.Ct. at 1722. The question remaining is whether Terabyte's opening brief satisfies the re-quirements for a notice of appeal as to the attorney's fee determination.

■ Federal Rule of Appellate Procedure 3(a) provides that "[a]n appeal ... from a district court to a court of appeals shall be taken by filing a notice of appeal ... within the time allowed by Rule 4." Although the time of appealability is jurisdictional and

strictly applied, *see Budinich*, 486 U.S. at 203, 108 S.Ct. at 1722, the requirements of Rule 3 are construed liberally. *Smith v. Barry*, —— U.S. ——, ——, 112 S.Ct. 678, 681, 116 L.Ed.2d 678 (1992). "[W]hen papers are 'technically at variance with the letter of [Rule 3], a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires.' " *Id.* at ——, 112 S.Ct. at 681–82 (quotation omitted). Rule 3 requires that the paper specify the party or parties taking the appeal, the judgment appealed from, and the court to which the appeal is taken. Fed.R.App.P. 3(c). The paper must "specifically indicate the litigant's intent to seek appellate review, the purpose of this requirement is to ensure that the filing provides sufficient notice to other parties and the courts." *Id.* at ——, 112 S.Ct. at 682 (citation omitted); *see Ortberg v. Moody*, 961 F.2d 135, 137 (9th Cir.) (liberal construction of Rule 3 applicable to parties proceeding through counsel), *cert. denied*, —— U.S. ——, 113 S.Ct. 225, 121 L.Ed.2d 162 (1992).

■ Here, the district court filed its order setting the amount of attorney's fees on June 9, 1992 and Terabyte filed its opening brief on June 18, 1992, well within the time limit for filing a notice of appeal pertaining to the fee award. *See* Fed.R.App.P. 4(a). Terabyte's opening brief satisfied the requirements of Rule 3 by specifying the parties to the appeal, designating the judgment appealed from and naming this court. *See Allah v. Superior Court of California*, 871 F.2d 887, 889–90 (9th Cir.1989) (appellant's opening brief served as notice of appeal). Thus, Terabyte's opening brief serves as the notice of appeal required by Rule 3, *see Smith*, —— U.S. at ——, 112 S.Ct. at 682, and we have jurisdiction over Terabyte's challenge to the attorney's fee award.

## DISCUSSION

### A. Trademark Infringement

■ "The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in ... commerce against unfair competition.' " *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992) (footnote omitted) (quoting 15 U.S.C. § 1127). Under 15 U.S.C. § 1114(1),

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods ... on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

"[L]iability for trademark infringement can extend *beyond* those who actually mislabel goods with the mark of another." *Inwood Lab.*, 456 U.S. at 853, 102 S.Ct. at 2188 (drug manufacturer can be contributorily liable for trademark infringement) (emphasis added).

"[T]rademark policies are designed '(1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition.' " *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 300–01 (9th Cir.1979) (discussing validity and enforceability of MONOPOLY game trademark); *see also Two Pesos, Inc.*, —— U.S. at —— & n. 15, 112 S.Ct. at 2764 & n. 15 (Stevens, J., concurring) (purpose of Lanham Act is twofold—to protect legitimate business and to protect consumers); *see generally*, J. Thomas McCarthy, *Trademarks and Unfair Competition* §§ 2.10–2.13 (3d ed. 1992). "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prod. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987); *see also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991) (trademark holder has right to control quality of its product through its own authorized distributors).

Here, both parties agree that the math coprocessors were relabeled from slow chips to fast (and more expensive) chips. There can be little doubt that Terabyte's customers were deceived into believing that they were purchasing fast math coprocessors when in reality they were receiving slower and less expensive chips. If Terabyte had obtained *non-Intel* math coprocessors which had been labeled as Intel math coprocessors, that would be a classic counterfeiting case leading to trademark infringement. *See Playboy Enter., Inc. v. Baccarat Clothing Co., Inc.,* 692 F.2d 1272, 1273–74 (9th Cir.1982); *see also* 15 U.S.C. § 1125(a); *see generally,* McCarthy *supra,* § 25.01[5][a]. Terabyte, however, obtained real Intel math coprocessors and only the model designations and trademark were altered. That, Terabyte argues, does not constitute trademark infringement because there is no confusion as to the *source* of the product, namely Intel. Terabyte contends that "confusion as to capability" is irrelevant for purposes of liability. We disagree.

Terabyte's interpretation of the Lanham Act focuses only on the identification function of the trademark and improperly ignores the good will, reputation, and consumer protection functions associated with a particular trademark. *See Two Pesos, Inc.,* —— U.S. at —— n. 15, 112 S.Ct. 2764 n. 15. In effect, Terabyte ignores the purpose of trademark protection. The public relies upon the mark so that "it will get the product which it asks for and wants to get." *Id.* The Supreme Court in *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), addressed in dicta a similar situation. There, defendants collected secondhand Champion spark plugs and repaired, reconditioned and resold them. The word, "Champion," remained on the reconditioned plugs. Champion sued defendants for trademark infringement. The lower courts concluded that defendants could not sell the plugs unless they clearly indicated on the plugs and on the packaging that the plugs were used and reconditioned. *Id.* at 126–28, 67 S.Ct. at 1137–38. Defendants were allowed to keep "Champion" on the plugs. The question before the Court was whether defendants were absolutely barred from us-

ing the "Champion" trademark on its reconditioned plugs. The Court noted that "[t]he spark plugs, though used, [were] nevertheless Champion plugs and not those of another make." *Id.* at 128, 67 S.Ct. at 1138. The Court continued:

> Cases may be imagined where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words "used" or "repaired" were added. But no such practice is involved here. The repair or reconditioning of the plugs does not give them a new design. It is no more than a restoration, so far as possible, of their original condition.... *Inferiority is immaterial so long as the article is clearly and distinctively sold as repaired or reconditioned rather than as new....* Full disclosure gives the manufacturer all the protection to which he is entitled.

*Id.* at 129–30, 67 S.Ct. at 1138–39 (citation and footnote omitted) (emphasis added). The Court stressed that full disclosure as to the condition of the product was required to avoid liability for trademark infringement. "When the mark is used in a way that does not deceive the public we see no such sanctity in the [trademark] as to prevent its being used *to tell the truth.*" *Id.* at 129, 67 S.Ct. at 1138 (quoting *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924)) (emphasis added); *see also Coca–Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1252–54 (9th Cir.1982) (trademark infringed where defendant substituted, without comment, Pepsi in response to specific orders for Coke).

Intel's math coprocessors were modified, i.e., relabeled, to deceive the public. Intel did not perform or authorize the chip modifications, and only the most formalistic of approaches could lead to a conclusion that Intel was the "source" of those chips once they were relabeled. The relabeling was so basic that "it would be a misnomer to call the article by its original name." *Champion Spark Plug,* 331 U.S. at 129, 67 S.Ct. at 1138. The modified math coprocessors exhibited a significantly higher failure rate compared to genuine Intel math coprocessors of the same

model. In essence, the modified math coprocessors were counterfeit copies of the faster and more expensive models. By distributing those products as particular genuine Intel math coprocessors, Terabyte threatened Intel's reputation and good will and deceived its customers who believed they were purchasing those particular models of math coprocessors. *Cf. id.* at 130, 67 S.Ct. at 1139; *Coca–Cola Co.,* 692 F.2d at 1252.

Although Intel was still the source of the chip, it was not responsible for marking it as, for example, an Intel 80287–10. The trademark induced the customer to rely on Intel's good name for the representation that the chip would work reliably at ten megahertz. Intel marked the chip with its name in connection only with the less demanding speed of six megahertz. When the chip genuinely from Intel was marked with a speed designation Intel would not have given it, the chip became a counterfeit Intel 80287–10 instead of a true Intel 80287–6. In other words, by the time the Intel markings had been scraped off or printed over, Intel did make the chip but it was no longer the source of the *product* which was being sold, except in the most ethereal of senses. But trademark law is not a question of ether; it deals with an exceedingly concrete method of conveying a great deal of information with a shorthand symbol. Terabyte's conduct is prohibited by the Lanham Act. *See Anti–Monopoly,* 611 F.2d at 301.

Terabyte argues that we reached a different conclusion in *Monte Carlo Shirt, Inc. v. Daewoo Int'l Corp.,* 707 F.2d 1054 (9th Cir. 1983). It is wrong. In *Monte Carlo,* we were not construing the Lanham Act, rather we were applying California state common law. *Id.* at 1056 n. 2, 1057–58. More importantly, on the facts of that case we determined that the products in question were genuine, both as to source and, most notably, as to quality. *Id.* at 1058 & n. 5. "The [products] were not altered or changed from the date of their manufacture to the date of their sale." *Id.* at 1058. In contrast, the district court here found that the quality of the altered math coprocessors was noticeably inferior to the quality of those straight from Intel. The changing or remarking not only misrepresented the capacity of the product, but also resulted in a higher failure rate. Indeed, for all practical purposes a different product was sold. *See Shell Oil,* 928 F.2d at 108. Purchasers of 387–25 math coprocessors from Terabyte were not purchasing Intel 387–25s. They were purchasing Terabyte 387–25s which should not have had an Intel trademark upon them. Terabyte insists, however, that the number itself makes no difference because *it* is not a trademark. In so doing, it relies upon *Intel Corp. v. Advanced Micro Devices, Inc.,* 756 F.Supp. 1292 (N.D.Cal.1992), in which the court determined that the numbers were generic. We do not see how that helps Terabyte; it actually hurts. It demonstrates that purchasers of 387–25s, for example, expect to get a product with a certain capability. The trademark on that product assures them that a certain source stands behind the asserted capability. Here Terabyte, not Intel, stood behind the assertion but the applied trademark suggested otherwise.

The district court did not err by concluding that Terabyte was liable for trademark infringement.

### B. Damages

Under 15 U.S.C. § 1117(a), the award of monetary remedies in trademark infringement cases includes an award of defendant's profits, any damages sustained by plaintiff, and the costs of the action. *Lindy Pen Co., Inc. v. BIC Pen Corp.,* 982 F.2d 1400, 1405 (9th Cir.1993), *petition for cert. filed,* 61 U.S.L.W. 3805 (U.S. May 14, 1993) (No. 92–1829). In "exceptional cases," the district court may award reasonable attorney fees to the prevailing party. 15 U.S.C. § 1117(a). In counterfeiting cases, "unless the court finds extenuating circumstances," treble damages or profits and reasonable attorney's fees are available. 15 U.S.C. § 1117(b). Under either subsection, awards are "never automatic and may be limited by equitable considerations." *Lindy Pen Co.,* 982 F.2d at 1405, 1409.

When seeking damages, "[a] plaintiff must prove both the fact and the amount of damage." *Id.* at 1407. "Damages are typically measured by any direct injury which a plain-

tiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Id.* "[T]he purpose of section 1117 is to 'take all the economic incentive out of trademark infringement.'" *Polo Fashions, Inc. v. Dick Bruhn, Inc.,* 793 F.2d 1132, 1135 (9th Cir.1986) (quoting *Playboy Enter., Inc.,* 692 F.2d at 1275).

■ The district court found that Terabyte bought and sold modified Intel math coprocessors. The district court calculated Intel's damages by multiplying the amount of Terabyte's sales of 287–10 and 387–25 chips by Intel's lost profits and taking 95% of the product. Terabyte argues that the district court's finding that 95% of Terabyte's total sales were infringing was erroneous. Terabyte claims that it bought from twenty-one different brokers nationwide and that only the chips from one source, Sabina, were counterfeit. Terabyte failed to introduce any evidence supporting the position that the other sources were legitimate. In fact, Terabyte obtained counterfeit math coprocessors from at least two other sources besides Sabina—AC–DC and Microstar. Each time Intel bought products from Terabyte, it received counterfeit chips. Undeniably the method the district court used to measure damages was somewhat crude. It depended on an inference that because the great majority of math coprocessors that Intel obtained from Terabyte over a six month period were counterfeit, it followed that the great majority of math coprocessors sold by Terabyte were counterfeit. That inference is not inexorable, neither is it fanciful. Much legal reasoning depends on that very kind of extrapolation from limited data. If there was some doubt about that result, Terabyte should have come forward with evidence to demonstrate the error. It did not. Under these circumstances, the district court's conclusion was not clearly erroneous. *See Lindy Pen Co.,* 982 F.2d at 1407–09; *cf. Eales v. Environmental Lifestyles, Inc.,* 958 F.2d 876, 881 (9th Cir.) (damages in copyright cases), *cert. denied,* — U.S. —, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992).

■ Terabyte argues that it should not be liable for Intel's damages because it did not profit from the counterfeiting scheme. Nevertheless, as we pointed out in *Polo Fashions,* the fact that Terabyte did not profit from the sale of infringing goods, if it be a fact, did not preclude the district court from awarding damages. *Polo Fashions, Inc.,* 793 F.2d at 1135.

The district court did not abuse its discretion by awarding damages against Terabyte. Indeed, if the district court did not award damages, Terabyte and other brokers would not be deterred from buying counterfeit math coprocessors at below market prices and selling them to their unknowing customers. Instead, brokers must be wary of counterfeit chips and either stop purchasing from tainted sources or notify the appropriate parties or both. Otherwise they risk liability for damages.

## C. Attorney's Fees

### 1. *Willful Conduct*

"An award [of attorney's fees] is within the discretion of the trial court and will not be disturbed absent abuse of that discretion." *Lindy Pen Co.,* 982 F.2d at 1409. Under section 1117(a), "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "While the term 'exceptional' is not defined in the statute, generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful." *Lindy Pen Co.,* 982 F.2d at 1409; *Sealy, Inc. v. Easy Living, Inc.,* 743 F.2d 1378, 1384 (9th Cir.1984).

■ The district court found that Terabyte "wilfully purchased and sold math coprocessors marked with counterfeit Intel trademarks and product-speed designations." The evidence indicated that Terabyte knew and intentionally bought remarked chips. Terabyte bought 287–10 chips for as little as $166.00 each when Intel would have sold the same chip to its distributor for $187.00. Terabyte had been told at least one way of detecting remarking; it does not appear to

have utilized *that* method.[2] In addition, it purports to be a long-time player in the chip market. It stretches credulity to be told that Terabyte simply could not ascertain when an Intel chip had been covered over and then remarked. Moreover, on at least one occasion, Terabyte received alleged 287–10 chips inside a 287–6 (slower chips) container—an indication that the chips within were remarked 287–6s. Because it knew that it had encountered problems in the past when it purchased its relatively inexpensive products, it should have been particularly sensitive. It was not; it was, at best, insouciant and at worst willful. The district court found the latter.

■ It is true that Terabyte officers testified at trial that they were not aware of and could not detect counterfeit chips. They argued that they tried to inspect the math coprocessors and that their reliance on the integrity of their sources was reasonable. Nevertheless, substantial evidence contradicted their testimony and "[d]etermining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Lab.*, 456 U.S. at 856, 102 S.Ct. at 2189.[3] Given the special deference owed to the district court's factual findings, the record supports a determination that Terabyte acted deliberately and willfully. *See Sealy, Inc.*, 743 F.2d at 1384. The district court did not abuse its discretion.

### 2. *Amount of Attorney's Fees*

■ When it sets a fee, the district court must first determine the presumptive lodestar figure by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Next, in appropriate cases, the district court may adjust the

"presumptively reasonable" lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975) (*Kerr*), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), that have not been subsumed in the lodestar calculation. *D'Emanuele v. Montgomery Ward & Co., Inc.*, 904 F.2d 1379, 1383 (9th Cir.1990). The *Kerr* factors are:

1. The time and labor required;
2. The novelty and difficulty of the questions;
3. The skill requisite to perform the legal services properly;
4. The preclusion of other employment due to acceptance of the case;
5. The customary fee;
6. The contingent or fixed nature of the fee;
7. The limitations imposed by the client or the case;
8. The amount involved and the results obtained;
9. The experience, reputation, and ability of the attorneys;
10. The undesirability of the case;
11. The nature of the professional relationship with the client;
12. Awards in similar cases.

*Kerr*, 526 F.2d at 70. The lodestar amount presumably reflects the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation. *D'Emanuele*, 904 F.2d at 1383.

"The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services.... If

---

**2.** Terabyte claims to have instituted a random screening process whereby one box out of ten would be opened and inspected—that was its quality control.

**3.** Terabyte contests a number of factual findings and inferences made by the district court. For example, it spends much energy arguing that it was justified in trusting the representations of Fred Worthy, one of its suppliers and that its actions, although somewhat unusual, were inno-

cent. Even if we agreed with Terabyte, "[a]n appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court 'might give the facts another construction [or] resolve the ambiguities differently....' " *Inwood Lab.*, 456 U.S. at 857, 102 S.Ct. at 2190. Terabyte is asking us to substitute our own judgment for that of the district court. That request is outside the scope of our authority.

 

the applicant satisfies its burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee...." *Jordan v. Multnomah County,* 815 F.2d 1258, 1263 (9th Cir.1987) (footnote and citation omitted). In order to facilitate appellate review, the district court must clearly articulate sound reasons in support of its fee award. *Sealy,* 743 F.2d at 1385 (fee award remanded because district court presented no basis for its findings); *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

While the district court did have evidence of Intel's hours expended and its customary fees, the court made no findings that the hours expended were reasonable and that the hourly rates were customary. The order merely awarded the fees without elaboration. "Such a procedure is inadequate." *Sealy,* 743 F.2d at 1385. That is particularly true where, as here, the requesting party submits mere summaries of hours worked. As Terabyte pointed out to the district court, those summaries alone made it very difficult to ascertain whether the time devoted to particular tasks was reasonable and whether there was improper overlapping of hours. Terabyte was not required to take Intel's word that every hour was needed and all overlap had been eliminated. While summaries can be used in proper circumstances, the underlying material must be made available. Fed.R.Evid. 1006. Under our adversary system, Terabyte was entitled to see just what was charged and why. What may seem obvious to Intel and to the district court is not obvious to us. That, among other reasons, explains our long-standing insistence upon a proper explanation of any fee award. It also explains Terabyte's need and right to peruse and parse Intel's fee demand.

Thus, the fee award must be set aside and returned to the district court for further consideration.

## CONCLUSION

Terabyte earnestly argues that it is a legitimate business which has done no wrong. The district court did not agree. Terabyte knowingly bought counterfeit computer chips. By selling them, it deceived its customers and put Intel's reputation in jeopardy. That conduct was blatant trademark infringement and was prohibited by the Lanham Act.

**AFFIRMED** on the merits. **REVERSED** and **REMANDED** as to the determination of the amount of attorney's fees.