
**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>MENSONIDES DAIRY LLC; ART<br>MENSONIDES, dba MENSONIDES<br>DAIRY LLC; TRIJNTJE MENSONIDES, aka<br>THERESA MENSONIDES, dba<br>MENSONIDES DAIRY LLC,<br>          Debtors. | BAP No. EW-20-1105-BGF<br><br>Bk. No. 2:18-bk-01681-WLH |
| NORTHWEST FARM CREDIT SERVICES,<br>PCA and FLCA,<br>          Appellants,<br>v.<br>MENSONIDES DAIRY LLC; ART<br>MENSONIDES; TRIJNTJE MENSONIDES,<br>          Appellees. | **MEMORANDUM**<sup>*</sup> |

Appeal from the United States Bankruptcy Court
for the Eastern District of Washington
Whitman L. Holt, Bankruptcy Judge, Presiding.

Before: BRAND, GAN, and FARIS, Bankruptcy Judges.

## INTRODUCTION

Appellants Northwest Farm Credit Services, PCA and FLCA

---

<sup>*</sup> This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

(collectively "Northwest") appeal an order determining that the debtors had not defaulted under their confirmed chapter 11[1] plan of reorganization. We AFFIRM the bankruptcy court's decision that there was no plan default. Northwest also appeals the bankruptcy court's oral ruling that the debtors were entitled to attorney's fees. However, in the order on appeal, the bankruptcy court denied the debtors' request for attorney's fees without prejudice. Therefore, this issue is not ripe for appeal and we do not decide it.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.     The parties and events leading to the bankruptcy filings**

Mr. and Mrs. Mensonides are the co-owners and sole members of Mensonides Dairy, LLC ("Dairy") (collectively "Debtors"), a large dairy farm in Washington. The Dairy employs about 70 full-time employees, and the Mensonides' adult children are also involved in the Dairy's management and daily operations. The Dairy's estimated value is $53.1 million.

Northwest is Debtors' primary secured lender. Debtors owed $29 million to Northwest at the time of the bankruptcy filings. Northwest's loans are cross collateralized and secured by substantially all of Debtors' assets including cattle, milk checks, crops, farm products, inventory, accounts receivable, equipment, and real property. Northwest's collateral also includes assets of a nondebtor affiliated company, A & T Well Drilling, LLC, which is

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

solely owned by the Mensonides. The Mensonides established this entity for the purpose of drilling wells to allow for beneficial use of all water rights for the Dairy's operations.

## B.     Postpetition events

After Northwest declared Debtors in default on the loans and began seeking appointment of a receiver to operate the Dairy, the Mensonides and the Dairy filed separate chapter 11 bankruptcy cases on June 14, 2018. The two cases were later consolidated.

### 1.     The Plan

Debtors filed their Joint Chapter 11 Plan of Reorganization ("Plan"). Prior to this, Debtors and Northwest entered into a settlement agreement ("Term Sheet") to be incorporated into the Plan. The Term Sheet contained various provisions including Northwest's remedies should Debtors default. Debtors' monthly Plan payments to Northwest were to be funded from what are called the Dairy Assignments. A portion of the funds that would normally be sent to the Dairy for milk sales were to be paid directly to Northwest. The Unsecured Creditors Committee fully supported the Plan.

The bankruptcy court entered an order confirming the Plan on August 16, 2019. The Plan's effective date was September 3, 2019. The Plan had the following provisions, most of which were also in the Term Sheet:

> **2.6(a) Dairy Assignment.** Among other payments, FLCA and PCA shall be paid by dairy assignment directly from Northwest Dairy Association (Darigold).

3

. . . .

**2.6(d) Liquidation of Well-Drilling Equipment**. . . . The Debtors shall have until August 30, 2019, to sell the well-drilling equipment. If the Debtors fail to sell the well-drilling equipment by August 30, 2019, Northwest shall have the discretionary right to: (a) have the well-drilling equipment marketed through a third party of Northwest's selection; (b) allow the Debtors to continue to market the equipment for sale; or (c) compel the Debtors to convey the equipment to Northwest. . . .

. . . .

**2.6(I) Loan Covenants**. All of the Debtors' covenants under the Plan shall each be a material term the breach of which will be a material default under the Plan. The Plan shall incorporate any non-financial covenants contained in Northwest's pre-petition loan documents.

Per the Plan, Northwest could give Debtors a written notice of default if Northwest asserted that Debtors had defaulted under the Plan. Upon receipt of a default notice, Debtors had 45 days to cure any default or file a motion contesting the alleged default. If Debtors failed to timely cure the default or contest it, Northwest could immediately appoint a Plan Agent to operate and manage the Dairy or liquidate the assets.

## 2.    Notice of Default

On October 31, 2019, less than two months after the Plan became effective, Northwest sent Debtors a Notice of Default alleging six defaults under the Plan, four of which are at issue in this appeal.

### a.    Well-Drilling Equipment default

Despite their efforts, Debtors were unable to sell the Well-Drilling

4

Equipment by the August 30 deadline. Northwest asserted that Debtors defaulted by ignoring its attempts to discuss how Northwest would exercise its discretionary right to sell the Well-Drilling Equipment. Northwest contended that Debtors' failure to cooperate was a default under ¶ 12 of the Term Sheet[2] and ¶ 2.6(d) of the Plan.

b.      Dairy Assignments default

Northwest asserted that it was to be paid by, among other ways, Dairy Assignments from Darigold. Although Debtors were current on their Plan payments, Northwest asserted that it had not yet received Plan payments via the Dairy Assignments and that Debtors had not responded to Northwest's attempts to resolve the issue. Northwest asserted that Debtors' failure to provide for the Dairy Assignments was a default under ¶ 2.6(a) of the Plan.

c.      Direct Notices default

Northwest asserted that ¶ 2.6(I) of the Plan required Debtors to comply with "all non-financial covenants contained in the pre-petition loan documents," including cooperating in maintaining Northwest's security interests in Debtors' collateral. That collateral included cattle and cattle sale proceeds. Prior to the Notice of Default, David Poor, Relationship Manager and Vice President of Northwest, had informed Debtors that, for Northwest to maintain priority over purchasers of Debtors' cattle, Northwest would be

_____

[2] Paragraph 12 of the Term Sheet provided: "**Cooperation:** The parties agree to cooperate with each other in good faith in attempting to implement the terms of this Term Sheet."

5

renewing its "Direct Notices" to the Dairy's cattle buyers. The Direct Notices required that all cattle sale payments be made payable to both Northwest and Debtors. Northwest asserted that Debtors had been unresponsive to its efforts to send Direct Notices to buyers or to get buyers to include Northwest as a payee. Northwest asserted that Debtors' failure to cooperate with its noticing efforts was a default under ¶ 2.6(I) of the Plan.

### d. Vehicle Titles default

Northwest maintained that it took a security interest in all motor vehicles owned by Debtors when it issued the loans in 2014, but Northwest was named on title to only some of the vehicles. Poor had requested that Debtors get Northwest named on all motor vehicle titles subject to the security agreement. Northwest asserted that Debtors had defaulted under ¶ 2.6(I) of the Plan by failing to ensure that it was named on certificates of title to all motor vehicle collateral.

### 3. Debtors' Motion for Determination

Thereafter, Debtors filed a Motion for Determination as to (A) Whether Debtors Have Defaulted Under the Plan; (B) Whether Debtors Have Cured Any Plan Defaults; and (C) Impact of Plan Defaults on Future Performance Under the Plan ("Motion for Determination"). Debtors maintained that no defaults occurred under the Plan or, alternatively, that any defaults had been cured or could be cured prior to the 45-day deadline.

For the Well-Drilling Equipment default, Debtors argued they had no

6

obligation under the Plan to discuss Northwest's options for the equipment. The Notice of Default did not specify which option Northwest had elected to pursue, and Northwest neither told Debtors to convey the equipment to Northwest nor indicated that it would be marketing the equipment through a third party. In any case, prior to the Notice of Default and per Northwest's request, Debtors continued to advertise the equipment while concurrently engaging an auction company to assess its value and create a marketing plan for a spring auction sale. Debtors argued that it was not until after issuing the Notice of Default did Northwest finally say that it wanted Debtors to assemble the equipment for a sale by Yarbro Auctions. Debtors complied with that request.

For the Dairy Assignments default, Debtors contended they had been in continuous negotiations with Northwest over the amount of the Dairy Assignments and had cooperated with Northwest in securing them. As explained by Debtors, the milk assignment was a logistical issue because a typical milk check was $1 million, which far exceeded the necessary Plan payment to Northwest of $132,000. Debtors explained that their initial calculations showed Plan payments would be between $122,000 - $130,000 per month, and Northwest had not provided them with enough information to assess if its initial proposal of $137,000 per month was appropriate or inflated. Debtors wanted to ensure that the amount Northwest received would not substantially exceed the monthly Plan payment. After several

7

meetings, Debtors said they believed the parties had agreed to Dairy Assignments of $137,000, and that any excess would be returned to Debtors. Two weeks after the Notice of Default, Debtors delivered to Northwest the executed Dairy Assignments for $137,000. Debtors argued that any delay in working out the terms of the Dairy Assignments was not unreasonable, especially since they had made all Plan payments to Northwest. If not resolving the issue sooner was a default under the Plan, Debtors argued that it was not material.

For the Direct Notices default, Debtors argued that they were unaware of any cattle buyers requiring Direct Notices outside of the parties already disclosed and known to Northwest. Debtors argued that Northwest was able to provide notice of its security interests to cattle buyers and had never asserted that its security interests were not attached or perfected. Debtors argued it was unclear why Northwest needed their cooperation in protecting its security interests in the cattle sale proceeds; Northwest could issue the Direct Notices unilaterally. Since no action by Debtors was necessary to preserve, maintain or perfect Northwest's security interests, Debtors argued that their alleged failure to cooperate could not constitute a default under the Plan. To the extent any default existed, Debtors argued it was not material.

Lastly, for the Vehicle Titles default, Debtors argued that Northwest had failed to specify which vehicles were at issue. Debtors had not purchased any new vehicles during the bankruptcy or since confirmation of the Plan.

Thus, argued Debtors, to the extent Northwest's security interest in any vehicles was not perfected, it would have been an issue that pre-dated the bankruptcy. Debtors maintained that Northwest did not inform them prior to confirmation that they needed to take action to perfect Northwest's security interest in the vehicles. In any case, after receiving the Notice of Default, Debtors discovered that some titles did not list Northwest as the legal title holder. Debtors asserted that they would have the issue resolved in a few days. Thus, to the extent any default existed, it had been cured.

Debtors maintained that Northwest had been pushing from the start to liquidate the Dairy and giving the Notice of Default was simply its latest attempt to accomplish that. Debtors argued that Northwest was acting in bad faith in relying on, at best, technical and non-material defaults in attempting to place them in default under the Plan. Debtors argued this was most evident from the fact that Northwest had received the Plan payments it bargained for. Debtors requested attorney's fees and costs for the Motion for Determination, arguing that they were authorized under the unilateral attorney's fee provision in Northwest's loan documents.

In response to the Motion for Determination, Northwest argued that, due to Debtors' history of defaulting on loan obligations, it required clear defaults, meaningful default consequences, and enforceable remedies in both the Term Sheet and the Plan and had to remain closely involved with Debtors' efforts to implement the Plan's terms post-confirmation. Northwest

9

maintained that Debtors had ignored its attempts to communicate and assist with implementing the Plan's terms, thus resulting in the Notice of Default.

As to the individual defaults, Northwest argued the following. Northwest contended that, prior to the Notice of Default, Debtors failed to submit a completed loan modification application to extend the deadline for them to sell the Well-Drilling Equipment and ignored Northwest's attempts to exercise its rights under the Plan. Northwest argued that Debtors' dilatory behavior and decision not to cooperate with Northwest constituted a default under ¶ 2.6(d) of the Plan. Northwest reiterated this same argument for the Dairy Assignments, that failure to receive Plan payments via the Dairy Assignments and Debtors' non-responsiveness to the issue prior to the Notice of Default was a default under ¶ 2.6(a) of the Plan. Northwest argued that the Plan and prepetition loan documents obligated Debtors to cooperate in protecting Northwest's security interests in the collateral. Because of Debtors' failure to cooperate with direct noticing efforts, argued Northwest, the cattle sale payments from Toppenish Livestock Yard failed to name Northwest as a payee and constituted a default under ¶ 2.6(I) of the Plan. Finally, as to the Vehicle Titles default, Northwest argued that Debtors had withheld the information as to which vehicles failed to name Northwest on the title and failed to cooperate in getting the issue resolved. Simply because this had been an issue for over three years, contended Northwest, did not mean Debtors could ignore the plain language of the Plan.

In reply, Debtors disputed Northwest's allegation of ignoring its attempts to resolve the alleged default items. In essence, Debtors maintained that they had been continually working with Northwest on these issues since Plan confirmation and were surprised to receive the Notice of Default.

**4.      The bankruptcy court's ruling on the Motion for Determination**

After hearing argument from the parties, including the Unsecured Creditors Committee which supported Debtors' position, the bankruptcy court made its oral ruling, finding that there were no defaults under the Plan. The court also found that Debtors, as the prevailing party on an action to enforce the contract, were entitled to reasonable attorney's fees and costs.[3]

Regarding the Well-Drilling Equipment default, the court found that

---

[3] While the attorney's fee issue is not ripe for appeal, we do make one observation. The bankruptcy court stated at the hearing that it could not award attorney's fees until the order for the Motion for Determination was final, which the court opined was after the exhaustion of any appeals. That is an incorrect statement of the law.

Although any potential fee award for Debtors is based on a Washington statute, the order on the Motion for Determination is a federal court order, and a federal court order or judgment is final upon entry, not upon the resolution of an appeal. *See Eichman v Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir. 1985) (pendency of an appeal does not suspend the operation of an otherwise final federal judgment for purposes of res judicata). The same is true if this were a Washington state court order or judgment. In Washington, an appeal does not suspend or negate the res judicata or collateral estoppel aspects of a state-court order or judgment. *Nielson ex rel. v. Spanaway Gen. Med. Clinic, Inc.*, 956 P.2d 312, 316 (Wash. 1998) (en banc); *Lejeune v. Clallam Cty.*, 823 P.2d 1144, 1149 (Wash. Ct. App. 1992) (a judgment becomes final for res judicata purposes at the beginning, not the end, of the appellate process).

Therefore, the bankruptcy court could have allowed Debtors to file their fee motion and promptly decided the issue.

nothing in ¶ 2.6(d) of the Plan required Debtors to cooperate, discuss, or do anything else relating to Northwest deciding what it wanted to do with the equipment after August 31, 2019. It was up to Northwest alone to choose one of the three options, and then ask Debtors to the extent they needed to be involved to assist in carrying out that option. Absent an affirmative covenant to do something further, the court found there was no default based on alleged non-cooperation with Northwest under ¶ 2.6(d) of the Plan.

For the Dairy Assignments default, the court focused on the language in ¶ 2.6(a) — "among other payments" — and the absence of a deadline for when the assignments had to be in place. The court found that as long as Northwest was receiving Plan payments, whether or not made from the Dairy Assignments, Debtors had not defaulted.

For the Direct Notices default, the court agreed that ¶ 2.6(I), which incorporates any non-financial covenants in Northwest's loan documents, obligated Debtors to take actions reasonably requested by Northwest to evidence or perfect its security interests and maintain priority in cattle sales. However, Northwest had to be clear about what action it wanted Debtors to take and not place the burden on them to figure it out. The court observed, when a contract imposes a definite obligation but is silent about the deadline for performance or states a time for performance in general or indefinite terms, Washington law states that the court must impose a "reasonable time." The court found that Debtors had complied with their covenant under the

Plan and loan documents to take actions reasonably requested by Northwest relating to the Direct Notices. While Northwest may have wanted a faster response, the court could not conclude that Debtors had failed to perform within a reasonable period of time after a specific request was made.

Lastly, with respect to the Vehicles Titles default, the court again agreed that Debtors were obligated to take actions reasonably requested by Northwest related to its security interests. The court found that, once the specific issue was brought to Debtors' attention, they began working in good faith to address it and did so within a reasonable time under the circumstances. Nothing in the Plan or loan documents required "immediate magical solutions or clairvoyance," which is what Northwest demanded of Debtors. In addition, the Vehicle Titles issue was known to Northwest since 2016, and the court was not willing to allow the Plan to be put into default status based on something that was actually known to Northwest before confirmation.

Thereafter, the bankruptcy court entered an order granting in part and denying in part the Motion for Determination. The court granted the motion to the extent that Debtors had not defaulted under the Plan. The court denied, without prejudice, the motion with respect to Debtors' request for attorney's fees. This timely appeal followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and

13

157(b)(2)(A). With the exception of the attorney's fees, which we discuss below, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1.    Did the bankruptcy court err in determining that Debtors did not default under the Plan?

2.    Did the bankruptcy court err in determining that Debtors were entitled to attorney's fees under RCW § 4.84.330?

## IV. STANDARDS OF REVIEW

We review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1198 (9th Cir. 2012). This appeal involves the interpretation of terms of a chapter 11 plan. A reorganization plan "resembles a consent decree and therefore, should be construed basically as a contract" with state law controlling its interpretation. *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993); *C.F. Brookside, Ltd. v. Skyview Mem'l Lawn Cemetery (In re Affordable Hous. Dev. Corp.)*, 175 B.R. 324, 329 (9th Cir. BAP 1994). Where contract interpretation does not require consideration of extrinsic evidence, it presents only an issue of law. *Viking Bank v. Firgrove Commons 3, LLC*, 334 P.3d 116, 119 (Wash. Ct. App. 2014). However, where contract interpretation requires inferences from extrinsic evidence, it presents questions of fact. *Id.*

We give substantial deference to the bankruptcy court's interpretation

14

of its own order and will only overturn that interpretation if it amounts to an abuse of discretion. *Marciano v. Fahs (In re Marciano)*, 459 B.R. 27, 35 (9th Cir. BAP 2011).

Ripeness is a jurisdictional issue subject to de novo review. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2006).

An award of attorney's fees is reviewed for an abuse of discretion; whether the bankruptcy court applied the correct legal standard is reviewed de novo. *See Or. Nat. Desert Ass'n v. Locke*, 572 F.3d 610, 613-14 (9th Cir. 2009).

A bankruptcy court abuses its discretion if it applies the wrong legal standard, or misapplies the correct legal standard, or if it makes factual findings that are illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

## V. DISCUSSION

### A. The bankruptcy court did not err in determining that Debtors did not default under the Plan.

Northwest first contends the bankruptcy court erred in finding that nothing in the Plan required Debtors to cooperate with Northwest and, on that basis, erroneously determined that Debtors were not in default for failing to cooperate with Northwest with respect to the Well-Drilling Equipment and the Direct Notices. As to the Well-Drilling Equipment, all Northwest asserted in the Notice of Default was that Debtors were ignoring its attempts to

15

discuss how Northwest would exercise its right to sell the equipment and that Debtors' failure to cooperate was a default under ¶ 12 of the Term Sheet and ¶ 2.6(d) of the Plan. The bankruptcy court found that Debtors had no obligation in ¶ 2.6(d) of the Plan to cooperate, discuss, or do anything relating to Northwest's decision on which of the three options it wanted to choose respecting the Well-Drilling Equipment. We agree that Debtors were not obligated under the Plan to assist Northwest in its decision-making process. To the extent the bankruptcy court found that Debtors were not required to "cooperate" respecting the Well-Drilling Equipment, its finding appears to be limited to discussions between Debtors and Northwest about Northwest's three options for disposing of it, not that Debtors had no obligation to cooperate once given a directive by Northwest.

In any case, the record reflects that Debtors did cooperate despite Northwest's indecision and conflicting statements about what it wanted to do with the Well-Drilling Equipment. As requested, Debtors submitted a sales plan and loan modification application to Northwest in mid-September 2019, but it was not to Northwest's liking. Poor's September 20 letter indicated that Debtors would likely be unable to satisfy Northwest's requirements to allow them to continue their sale efforts and that Northwest intended to exercise its option to have the Well-Drilling Equipment sold by a third party. Yet, in that same letter, Poor gave Debtors until September 25 to submit an acceptable loan modification application; if they did not, Poor said that Northwest

would "consider all of its options." After Debtors sent the application on September 25, Poor still complained that it was incomplete and gave them until October 15 to send a corrected one. It is not clear if any further applications were submitted. Nonetheless, during this time Debtors were simultaneously advertising the equipment and working with an auctioneer to get the equipment itemized and ready for a spring auction. Finally, on October 31, the day Northwest sent the Notice of Default, Poor unequivocally expressed Northwest's intent to have a third party sell the equipment. Yet, it was not until November 12 that Northwest named Yarbro Auctions as the chosen seller. Nothing in the record indicates that Debtors refused to cooperate with Northwest during the time that Northwest was deciding which option to take respecting the Well-Drilling Equipment, and certainly not once Northwest finally made a decision. Accordingly, the bankruptcy court did not err in finding that Debtors did not default based on alleged non-cooperation with Northwest under ¶ 2.6(d) of the Plan for the Well-Drilling Equipment.

As for the Direct Notices, Northwest argued that Debtors were obligated to cooperate with its attempts to notify cattle buyers of Northwest's security interests and that Debtors failed to do so in violation of ¶ 2.6(i) of the Plan. Contrary to Northwest's assertion, the bankruptcy court did not find that Debtors had no obligation to cooperate with Northwest on the Direct Notices issue. Rather, it found that Debtors were required to take actions

reasonably requested by Northwest to evidence or perfect Northwest's security interests in order to maintain priority in the cattle sales. However, the court found that Northwest had to be clear about what actions it wanted Debtors to take, and that Debtors had a reasonable time to take any such actions and did so. Northwest contends the bankruptcy court's factual findings are clearly erroneous. We disagree.

On several occasions, Debtors provided Northwest with the identities of all cattle buyers including Toppenish Livestock Yard. Further, Northwest did not dispute that it could issue the Direct Notices to these buyers unilaterally without Debtors' assistance. In fact, Poor stated multiple times that Northwest would be renewing the Direct Notices to Toppenish Livestock Yard and others. And nothing in the record shows that Debtors refused to sign any Direct Notices provided by Northwest, if that was even a contention. To the extent that Debtors were to assist in getting buyers to make out checks with Northwest named as payee, the record reflects that Debtors were trying to resolve that issue and not "ignoring" it. Even Northwest's counsel admitted at the hearing on the Motion for Determination that there was confusion on behalf of Toppenish Livestock Yard as to whom was to be named as payee on the checks. In addition, prior to the Notice of Default and after, Debtors and Northwest were still negotiating the issue of daily calf sales and how to deal with the administrative burden of having Northwest named as payee on these small and frequent checks. Accordingly, the bankruptcy court did not

err in finding that Debtors did not default based on alleged non-cooperation with Northwest under ¶ 2.6(i) of the Plan for the Direct Notices.

Northwest next contends the bankruptcy court erred in determining that Debtors had not defaulted on the Dairy Assignments. The court found, based on the language of ¶ 2.6(a) of the Plan and other evidence: (1) it was contemplated Plan payments to Northwest would come from either the Dairy Assignments or other sources; (2) Debtors made all Plan payments while negotiating the assignment terms; (3) no deadline existed for when the assignments must be in place; and (4) Debtors provided a compelling explanation for why they needed to address the administrative issues with the assignments.

Northwest contends that the court's interpretation of ¶ 2.6(a) is illogical and not supported by fact or law. That paragraph states: "Among other payments, FLCA and PCA shall be paid by dairy assignment directly from Northwest Dairy Association (Darigold)." Specifically, Northwest argues that the court erroneously interpreted ¶ 2.6(a) to mean that FLCA and PCA **may** be paid by Dairy Assignments as opposed to **shall**. Northwest argues that it bargained for direct payment from the Dairy Assignments and that the "among other payments" language merely recognized that Debtors were obligated to make several forms of payments to Northwest — e.g., from milk sales, from equipment sales, and from cattle sales. In other words, Dairy Assignments were just one form of payment Debtors were required to make

19

under the Plan.

If Plan payments to Northwest were to be paid exclusively from Dairy Assignments, then it is not clear why the parties included the "among other payments" language. If "among other payments" meant that Debtors could pay with funds from non-milk sale sources, which is what the bankruptcy court concluded, they did so and could not be in default. In any case, ¶ 2.6(a) of the Plan also lacked any deadline for when the Dairy Assignments were to begin. Northwest argues that the deadline was obviously when the first Plan payment was due – October 1, 2019. The record belies this. Poor's September 6, 2019 email noted that Northwest was still working with Darigold to set up the Dairy Assignments and that Plan payments to Northwest via the Dairy Assignments would likely not be set up in time for the October installment. He advised Debtors to make the October payment directly. Notably, Poor did not say this would violate ¶ 2.6(a) or would constitute a default under the Plan. Poor's September 20, 2019 letter acknowledged that Northwest was still preparing drafts for the Dairy Assignments for Debtors' review. Debtors also raised legitimate concerns about the amount of the Dairy Assignments, both before and after the Notice of Default.

In short, the record reflects that Debtors were not failing to cooperate with Northwest in getting the Dairy Assignments in place. As Debtors correctly point out, nowhere in the Plan does it state that Debtors must accept Northwest's determinations without question, or that Northwest has the final

20

say in all things and can unilaterally make decisions. Accordingly, the bankruptcy court did not err in finding that Debtors did not default on the Dairy Assignments under ¶ 2.6(a) of the Plan.

Lastly, Northwest contends the bankruptcy court erred in determining that Debtors had not defaulted on the Vehicle Titles under ¶ 2.6(I) of the Plan, because they complied with requests to get Northwest named on the titles to all motor vehicles and did so within a reasonable time. Northwest argues that Debtors ignored its reasonable requests to resolve the issue and did not work in good faith to address it. Again, the record belies this. The issue of Vehicle Titles was raised at the parties' meeting on September 13, 2019, a few weeks after Plan confirmation. Debtors maintained that they were not aware of the issue until then, though Poor said Mr. Mensonides was aware of it in 2016. Poor's September 20 letter acknowledged that the Mensonides' daughter was still working on the matter but that the parties had not discussed a deadline. Poor unilaterally suggested October 1. In his October 4 email, Poor gave Debtors until November 1 to supply Northwest with the documentation and assistance necessary to obtain all vehicle titles so that it could finish the perfection process with the Department of Licensing. Even though Debtors were given a deadline of November 1, Northwest declared a default on the Vehicle Titles in the October 31 Notice of Default.

Not only was it disingenuous for Northwest to complain of Debtors' purported default when Poor's unilateral November 1 deadline for

21

compliance had not even run, the record reflects that Debtors were working with Northwest to get the matter resolved and did so in a reasonable amount of time. Further, we agree with the bankruptcy court that it would be inequitable to allow Northwest to call a default under the Plan based on circumstances that were known to it before the confirmation hearing. Accordingly, the bankruptcy court did not err in finding that Debtors did not default based on alleged non-cooperation with Northwest under ¶ 2.6(I) of the Plan for the Vehicle Titles.

**B.** **The issue of attorney's fees is not ripe for appeal.**

Northwest argues that the bankruptcy court erred in determining that Debtors were entitled to attorney's fees as the prevailing party under RCW § 4.84.330. Debtors, on the other hand, contend that the court's decision was correct.

This issue is not ripe for appeal. While the bankruptcy court indicated in its oral ruling that Debtors were entitled to attorney's fees as the prevailing party under RCW § 4.84.330 upon proof, in its written order the court denied fees, without prejudice, stating that Debtors **may** be entitled to fees under the statute and indicating that it would revisit the issue once they filed a renewed motion. Northwest could oppose Debtors' fee motion, if filed. At this point, the matter is hypothetical. Until Debtors file their fee motion and the court awards an amount of attorney's fees or denies them, the matter is not ripe for appeal. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 617 (9th Cir. 1993)

(award of attorney's fees does not become final and appealable until the amount of the fee award is determined). Unless the matter is ripe, we lack jurisdiction to consider it. *Principal Life Ins. Co.*, 394 F.3d at 669 ("If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction.").[4]

## VI. CONCLUSION

For the reasons stated above, we AFFIRM the bankruptcy court's decision that Debtors did not default under the Plan. However, we lack jurisdiction to decide the issue of attorney's fees and therefore DISMISS that portion of the appeal.

---

[4] Northwest also alleges bias from the bankruptcy court. Northwest fails to cite any legal authority for its contention, and the alleged bias appears to be based on Northwest's opinion that the court inconsistently applied the provisions of the loan documents and misread the Plan so it could find in favor of Debtors. Given the lack of a supported argument, Northwest has not met its "exceptionally heavy burden" to "'overcome a presumption of honesty and integrity in those serving as adjudicators.'" *Jimenez v. ARCPE 1, LLP (In re Jimenez)*, 613 B.R. 537, 546-47 (9th Cir. BAP 2020) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).